IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JASON STORRS, and AMBER SMITH, | |
| Plaintiffs, | **8:21-CV-175** |
| vs. | |
| TRAVIS ROZEBOOM, in his individual capacity; PRESTON MAAS, in his individual capacity; and BRIAN MALONE, in his individual capacity, | **MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

This case arises after the police made a mistake.

While on patrol, officers with the Papillion, Nebraska, police department received a radio dispatch notice of a shoplifting incident at Dick's Sporting Goods at Shadow Lake Towne Center in Papillion, Nebraska. Radio traffic mistakenly suggested that officers in the area should look for a four-door silver car with a black male and a black female inside leaving the general area of the store. Plaintiff Jason Storrs is a black male who happened to be driving a two-door silver car in the area of Dick's Sporting Goods seconds after the radio dispatch was issued. The officers pulled over Mr. Storrs.

Mr. Storrs had just picked up his girlfriend Plaintiff Amber Smith from work. Ms. Smith is white and did not meet the description in the initial radio dispatch. Neither Mr. Storrs nor Ms.

1

Smith had anything to do with the shoplifting incident. Indeed, neither had visited Dick's Sporting Goods.

What happened next was unfortunate. Mr. Storrs and Ms. Smith were understandably upset when they were pulled over. The stop quickly escalated when Mr. Storrs and Ms. Smith became uncooperative and combative with the officers. In the end, Mr. Storrs was tased, and Ms. Smith was thrown to the ground by an officer trying to detain her.

The Court is not blind to the societal issues raised by this case. Our country is in the middle of a great debate regarding police action, particularly police action against members of minority groups. The undersigned judge acknowledges the importance of this case, and those like it, given the highly public nature of other cases of police action involving minorities.

The law in our country gives police officers considerable protection from lawsuits when incidents arise from the performance of their duties. The question that the Court must decide in this case is not whether the officers broke the law, but whether the officers should be held personally liable for their actions in the thirty-minute stop of Mr. Storrs and Ms. Smith. After extensive consideration, the Court has determined that the law requires this Court to decide this matter now by granting the Defendants' Motion for Summary Judgment.

## I.   INTRODUCTION

### A.  Factual Background[1]

Jason Storrs and Amber Smith (collectively, Plaintiffs) have sued three Papillion, Nebraska, Police Department officers—Sergeant Preston Mass, Officer Travis Rozeboom, and

---

[1] As an initial matter, Defendants object to Plaintiffs filing a "Supplemental Statement of Facts" in their opposition brief. *See* Filing 81 at 2. Specifically, Defendants contend that Plaintiffs' decision to articulate their own statement of facts in an opposition brief contravenes the procedure set forth in Nebraska Civil Rule (NECivR) 56.1(a). Filing 81 at 2. While maintaining their objection, Defendants respond to the statement of facts Plaintiffs allege in their opposition

Officer Brian Malone (collectively, Defendants)—in their individual capacities. Filing 17 at 1, 2. Plaintiffs' claims, alleging violations of the First, Fourth, and Fourteenth Amendments to the United States Constitution, arise from an investigatory stop and the escalation of that incident. The events giving rise to these claims were recorded by police-worn body cameras and a police squad car dash camera.[2] Neither party suggests that the video footage has been "doctored or altered in anyway" nor does either party contend that what "it depicts differs from what actually happened." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court now recounts the parties' agreed upon facts and the facts that are "depicted by the videotape." *Id.* at 381; *see also Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015) (viewing "the facts in the light depicted by the videotape").

### 1. The Dispatch Call and Initial Response

The events giving rise to this suit all occurred within a relatively short span of time on December 26, 2019, along a stretch of Highway 370 close to the Shadow Lake Towne Center shopping complex (Shadow Lake) in Papillion, Nebraska. *See generally* Filing 17. On that night, Storrs had just picked up his girlfriend, Smith, from her place of employment in Shadow Lake.

---

brief. *See* Filing 81 at 2-8. Defendants' objection is without merit. NECivR 56.1(b)(1) states that a "party opposing a summary judgment motion must include in its brief a concise response to the moving party's statement of material facts." Nothing in the text of this rule suggests that in complying with this requirement, a party opposing summary judgment is somehow barred from offering its own statement of facts and is instead cabined to the limited factual landscape as put forth by the movant. Further, NECivR 56.1 states that NECivR 7.1 also applies to summary judgment motions unless otherwise stated. *See* NECivR 56.1. NECivR 7.1(b)(2)(A) states that "[w]hen filing the opposing brief, the opposing party must also file and serve supporting evidentiary material not filed. A factual assertion in the opposing brief must cite to the pertinent page of the pleading, affidavit, deposition, discovery material, or other evidence on which the party relies." Thus, NECivR 7.1 expressly contemplates the need for an opposing party to raise factual assertions in an opposition brief. For the purposes of ruling on this motion for summary judgment, the Court will consider all undisputed material facts irrespective of whether these facts were set out in the Defendants' opening brief in support of summary judgment or the Plaintiffs' brief in opposition.

[2] Four different video cameras recorded the events involved in this case: (1) Officer Rozeboom's body camera, (2) Officer Malone's body camera, (3) Sergeant Maas's body camera, and (4) Officer Malone's dash camera. Officer Rozeboom's body camera is cited as Filing 70-1, Exhibit B. Officer Malone's body camera is cited as Filing 70-2, Exhibit B. Sergeant Maas's body camera is cited as Filing 70-3, Exhibit B. Officer Malone's dash camera is cited as Filing 77-3.

Filing 67 at 11 (¶1); Filing 81 at 2 (¶1). Storrs was driving a silver, two-door BMW and had his pet dog in the car as well. Filing 67 at 11 (¶1); Filing 81 at 2 (¶1); Filing 67 at 4 (¶¶17, 18); Filing 76 at 6 (¶¶17, 18). After picking up Smith from the salon where she worked, the two drove away together and began to exit the shopping complex area. Filing 67 at 3 (¶3); Filing 76 at 4 (¶3); *see also* Filing 76 at 12 (¶3). At no point that night did Storrs or Smith visit the Dick's Sporting Goods store located in Shadow Lake. Filing 76 at 11 (¶2); Filing 81 at 2 (¶2).

Meanwhile, Officer Rozeboom, Officer Malone, and Sergeant Maas were working on duty in their capacity as uniformed law enforcement officials with the City of Papillion Police Department. Filing 67 at 2 (¶1); Filing 76 at 3 (¶1). According to affidavits filed by Defendants, Sergeant Maas was the most senior of the three Defendants at the time, having been a sergeant with the Papillion Police Department for a little over four years. Filing 70-3 at 1 (¶1). Officer Malone was the second most senior and had approximately three and a half years of experience on the Papillion Police Department. Filing 70-2 at 1 (¶1). Officer Rozeboom had been employed by the Papillion Police Department for less than a year at the time. Filing 70-1 at 1 (¶1).

At about 6:50 p.m., around the same time that Storrs and Smith were leaving the shopping complex area, Officer Rozeboom and Officer Malone were dispatched to the Dick's Sporting Goods located at 7403 Towne Center Parkway based upon "a shoplifting/theft in progress call." Filing 67 at 2 (¶2); Filing 76 at 3 (¶2). Sergeant Maas also heard the Sarpy County dispatcher call Officers Rozeboom and Malone to the scene. Filing 67 at 3 (¶3); Filing 76 at 4 (¶3). All three officers were in their own, separate patrol vehicles. *See generally* Filing 70-1, Exhibit B. The dispatcher advised the Papillion Officers that a black male and black female were removing security devices from merchandise, concealing items, and were leaving Dick's Sporting Goods. Filing 67 at 3 (¶4); Filing 76 at 4 (¶4). As Officer Rozeboom would later explain in his written

4

report, the dispatcher specifically advised "that the caller reported a black female had concealed items in her purse and was now with a black male leaving the store. The black female was described as wearing all black and the black male was described as having a stocking cap with a 'pompom' on top." Filing 70-1, Exhibit A at 3.[3]

Shortly thereafter, dispatch informed the Papillion Officers that the suspects were heading eastbound in a silver four-door sedan. Filing 67 at 3 (¶5); Filing 76 at 4 (¶5). When this call came through, Officer Malone was located near the intersection of 72nd and Towne Center Parkway. Filing 67 at 3 (¶6); Filing 76 at 3 (¶6). Officer Malone observed "what he thought was a silver four-door sedan" near Dick's Sporting Goods being driven by a black male with another individual sitting in the passenger seat. Filing 67 at 3 (¶7); Filing 76 at 4 (¶7). Officer Malone then witnessed this vehicle turn north onto 72nd Street. Filing 67 at 3 (¶7); Filing 76 at 4 (¶7). Officer Malone's dash-camera footage shows that he followed this vehicle into the right turn lane on 72nd Street, then followed this vehicle after it turned east onto Highway 370. Filing 77-3 at 00:00-00:25; *see also* Filing 67 at 3 (¶8); Filing 76 at 4 (¶8). The parties dispute whether the vehicle made an improper turn onto Highway 370 such that Officer Malone had a lawful basis for pulling the vehicle over separate and apart from any detention related to the shoplifting investigation. *See* Filing 67 at 3 (¶8); Filing 76 at 4 (¶8). When Officer Rozeboom heard Officer Malone report over the radio that he had located a silver sedan leaving the Shadow Lake Towne Center area, Officer Rozeboom responded toward Officer Malone's location in anticipation that Officer Malone would

---

[3] Defendants do not specifically admit this clarifying fact in their Brief. *See* Filing 67 at 3 (¶4). Plaintiffs point to it in their opposition filing. Filing 76 at 4 (¶4). This statement derives from Officer Rozeboom's own written report—which Defendants themselves filed for the purposes of evidentiary support in favor of their Motion for Summary judgment. *See* Filing 70-1, Exhibit A at 1, 3. In Defendants' Reply Brief, they later admit "[t]he female shoplifting suspect was reported as a Black female" and "[t]he male shoplifting suspect was reported as a Black male wearing a stocking cap with a 'pompom' on top." *See* Filing 76 at 12 (¶¶5, 7); Filing 81 at 2-3 (¶¶5, 7).

conduct a traffic stop of the vehicle to investigate the shoplifting complaint. Filing 67 at 3 (¶¶9-10); Filing 76 at 4-5 (¶¶9-10).

    2.   *The Traffic Stop*

Officer Malone initiated a traffic stop of the vehicle near the intersection of 66th Street and Highway 370. Filing 67 at 4 (¶14); Filing 76 at 5 (¶14). This stop occurred "immediately next to active lanes of travel, with vehicles traveling at 55 miles per hour or greater on an unlit state highway." Filing 67 at 4 (¶15); Filing 76 at 5 (¶15). Officer Malone's dash camera footage shows that he began approaching the driver's side of the stopped vehicle with his gun unholstered and less than 10 seconds after it came to a complete stop along the side of the highway. Filing 77-3 at 01:00–01:10. Officer Rozeboom then approached the passenger's side of the vehicle seconds after that. Filing 77-3 at 01:00–01:20.

The recording from Officer Malone's body camera does not capture the first 45 seconds of his interaction with Plaintiffs. Instead, much of what was said during that period was recorded on Officer Rozeboom's body camera, although Officer Rozeboom's position does not provide clear video of Officer Malone's initial interactions with the people in the vehicle. *See* Filing 70-1, Exhibit B at 03:40–04:25. Approximately 25 seconds after making initial contact with Plaintiffs in the vehicle, Officer Malone informed them that there was a description matching Storrs and his vehicle near Dick's Sporting Goods. Filing 70-1, Exhibit B at 04:04–04:08. Officer Rozeboom's body camera recording does not pick up what Storrs said in reply, but Officer Malone next said, "Listen, this goes really quickly. If you're not involved . . . ." Filing 70-1, Exhibit B at 04:15. Storrs appeared to interject at this point, but what he said is not clearly captured on the recording. *See* Filing 70-1, Exhibit B at 04:18. Officer Malone then asked Storrs, "Will you listen? Will you listen? Will you listen?" Filing 70-1, Exhibit B at 04:21–04:28.

Officer Malone's body camera began recording at this point and that recording more clearly captures the words exchanged between Plaintiffs and Officer Malone. *See* Filing 70-2, Exhibit B at 00:01. Officer Malone told Plaintiffs, "This goes really easy. If you're not involved then, then it's simply someone that . . ." but before Officer Malone finished, Storrs responded, "Involved in what?" Filing 70-2, Exhibit B at 00:00–00:10. Immediately thereafter, and before Officer Malone said anything, Smith began addressing Officer Malone and told him that she required his "badge number and [his] name right now." Filing 70-2, Exhibit B at 00:00-00:14. Storrs also remarked, almost simultaneously, "This is bullshit!" Filing 70-2, Exhibit B at 00:14.

### 3. *The Escalation of the Situation*

At that point, Officer Malone again repeated his "this goes really easy" refrain, except this time he attempted to offer an ultimatum by stating that option "a" was "to go in handcuffs right now." Filing 70-2, Exhibit B at 00:14–00:19. Upon hearing this—and before Officer Malone could offer option "b"—Plaintiffs began verbally expressing their displeasure at the prospect of option "a." Filing 70-2, Exhibit B at 00:18. Storrs, growing more agitated by this point, repeatedly demanded to know what it was he did. Filing 70-2, Exhibit B at 00:18–00:27. Officer Malone directed Storrs to turn off his vehicle. Filing 70-2, Exhibit B at 00:28. Storrs did not comply and instead said, "I'm not doing shit," followed by multiple other profanities. Filing 70-2, Exhibit B at 00:30; Filing 67 at 5 (¶22); Filing 76 at 6 (¶22). Around that same time, Smith took out her cell phone and pointed it toward Officer Malone—ostensibly recording the interaction. Filing 70-2, Exhibit B at 00:33. Storrs, whose voice remained raised and whose sentences now began to include more expletives, again demanded to know what it was he had supposedly done and said that he did not understand what was going on. Filing 70-2, Exhibit B at 00:36. In response, Officer Malone

7

asked, "Can I explain it to you then?" Filing 70-2, Exhibit B at 00:37. Storrs replied, "Then talk!" Filing 70-2, Exhibit B at 00:38.

Officer Malone again told Storrs that a description of a person and vehicle matching him and his vehicle were seen leaving Dick's Sporting Goods and that there was a report of someone stealing items from Dick's Sporting Goods. Filing 70-2, Exhibit B at 00:42–00:54. Storrs and Smith verbally protested in response. Filing 70-2, Exhibit B at 00:55. After Officer Malone asked Storrs whether he "did it," Storrs and Smith immediately became angrier than before. Filing 70-2, Exhibit B at 01:00. Storrs insisted that he had just picked Smith up from work, and Smith called Officer Malone a "racist piece of crap." Filing 70-2, Exhibit B at 01:05. Soon thereafter, Storrs told Officer Malone he was a "piece of fucking shit." Filing 70-2, Exhibit B at 01:19. For the next 20 or so seconds, Smith and Storrs continued their verbal protest while Officer Malone stood largely silent and police backup arrived on the scene. Filing 70-2, Exhibit B at 01:20–01:45.

When Officer Malone did speak again, he told Storrs (for the second time) to turn his car off so that the two could "have a conversation out here." Filing 70-2, Exhibit B at 01:45–01:50. Storrs refused and stated, "I'm not doing shit. I ain't getting out of the fucking car, you racist piece of shit. You just profiled me . . . This is bullshit." Filing 70-2, Exhibit B at 01:50–01:58; Filing 67 at 6 (¶29); Filing 76 at 7 (¶29). Officer Malone said that he was trying to "clear it up," introduced himself as Officer Malone, and asked Storrs for his name. Filing 70-2, Exhibit B. at 01:05–02:05. Eventually, Storrs told Officer Malone his first name and Officer Malone introduced himself again. Filing 70-2, Exhibit B at 02:20. Storrs told Officer Malone, "I don't care," repeated that he did not steal anything, said that he had just picked up his girlfriend from work, and reiterated that this was "bullshit." Filing 70-2, Exhibit B at 02:20. Officer Malone advised Storrs that if he was not

8

involved, "then you guys are going to go on your way here in a minute." Filing 70-2, Exhibit B at 02:30.

While this was going on, Smith was on the phone requesting the assistance of a sheriff. Filing 70-2, Exhibit B at 02:30–02:50. The video footage does not clearly capture Smith's dialogue with the individual on the other end of the phone; however, Smith can be heard telling this individual the name "Sergeant Malone." Filing 70-2, Exhibit B at 02:33. While still on the phone, Smith then directly asked Officer Malone, "Are you a sergeant? What are you Officer . . . how many stripes you got, Malone?" Filing 70-2, Exhibit B at 02:34–02:40. Immediately after Smith made this remark, Storrs told Smith "Don't talk crap." Filing 70-2, Exhibit B at 02:40.

When Officer Malone tried to get Storrs out of the car to speak with him, Storrs asked whether they were going to "stun" him and again repeated that he "didn't steal shit." Filing 70-2, Exhibit B at 02:50. Despite his previous refusals, Storrs exited the vehicle without a further request from Officer Malone. Filing 70-2, Exhibit B at 02:55. While exiting the car, Storrs again demanded to know, "What the fuck did I steal?" Filing 70-2, Exhibit B at 02:57. As soon as Storrs exited his vehicle, Officer Malone put his firearm back in his holster and directed Storrs to put his hands behind his back. Filing 70-2, Exhibit B at 02:58; Filing 77-3 at 04:52. Storrs did not comply with this demand. Filing 70-2, Exhibit B at 02:59. Instead, he said that he would "wait for someone else to come here" and that he "didn't steal shit." Filing 70-2, Exhibit B at 03:00. He then pointed at three of the officers on scene and yelled "You're a racist, you're a racist, and you're a racist!" Filing 70-2, Exhibit B at 03:05. While he was doing this, Officer Malone told Storrs to "turn around" but he did not comply. Filing 70-2, Exhibit B at 03:05. Smith then exited the vehicle by hopping over the center console and using the driver's side door closest to the highway. Filing 70-2, Exhibit B at 03:07. The situation escalated further from there.

### 4. The Confrontation Outside the Vehicle

While Smith got her cell phone and recorded what was going on, Officer Malone told Storrs to "just relax." Filing 70-2, Exhibit B at 03:08–03:13. Storrs again demanded to know what it was he stole and yelled "these guys are fucking pieces of shit!" Filing 70-2, Exhibit B at 03:15. Around this same time, Officer Rozeboom drew his taser and pointed it toward Storrs. Filing 70-2, Exhibit B at 03:15. Storrs initially complied with the officers' request to turn around and briefly placed his hands behind his back, but his compliance lasted only a few seconds. Filing 70-2, Exhibit B at 03:20. As soon as Storrs was informed that he was about to be handcuffed, he quickly turned around, raised both hands in the air, cupped them underneath his armpits, and insisted that he was not under arrest. Filing 70-2, Exhibit B at 03:22. In response, Sergeant Maas—who also had his taser drawn by this point—advised Storrs that he was being detained. Filing 70-2, Exhibit B at 03:25. Storrs stepped toward Sergeant Maas and said, "No, I'm not!" Filing 70-2, Exhibit B at 03:27.

Smith still had her cell phone out to record the encounter and further inserted herself into the situation by likewise insisting that Storrs was not being detained. Filing 70-2, Exhibit B at 03:28. She positioned herself between Storrs and Sergeant Maas. Filing 70-2, Exhibit B at 03:29. Smith twice demanded to know why it was that Storrs was being detained, and Sergeant Maas explained that it was pursuant to the shoplifting investigation. Filing 70-2, Exhibit B at 03:32. Smith began walking toward Sergeant Maas on to the busy highway and asserted that they could not detain Storrs. Filing 70-2, Exhibit B at 03:30. With her voice growing louder, and while getting closer to Sergeant Maas, Smith remarked, "Are you insane?" Filing 70-2, Exhibit B at 03:35. Sergeant Maas then grabbed Smith's left arm, but she resisted and attempted to break free. Filing 70-2, Exhibit B at 03:39.

10

As Smith attempted to escape Sergeant Maas's grip, she screamed and fell backward toward Storrs. Filing 67 at 8 (¶44); Filing 76 at 8 (¶44); Filing 77-3 at 05:37. Storrs reacted by reaching his arms out toward Smith. Filing 77-3 at 05:58. He did so by pivoting his upper body in the general direction of Smith and grabbed her as she was trying to pull away from Sergeant Maas's grip. Filing 77-3 at 05:38. In the midst of this commotion, Officer Rozeboom deployed his taser at Storrs. Filing 77-3 at 05:40; *see also* Filing 67 at 8 (¶46); Filing 76 at 9 (¶46). The taser prongs struck Storrs and he went down to the ground. Filing 77-3 at 05:40; Filing 67 at 8 (¶47); Filing 76 at 9 (¶47). The parties dispute where the taser probes struck Storrs, but both sides agree that he was struck. *See* Filing 76 at 9 (¶47) (Plaintiffs denying that the taser probes struck Storrs in the left thigh and instead contending that he was struck in the genitals).

Once Storrs went down to the ground, Officer Rozeboom and Sergeant Maas worked together to handcuff him. Filing 77-3 at 05:44. While they did this, Officer Malone turned his attention toward Smith and grabbed her by the left arm. Filing 77-3 at 05:45. After pushing Smith between himself and the passenger side of the vehicle, Officer Malone hooked his right arm across Smith's neck and collarbone area to grab her left shoulder before throwing her face-first to the ground. Filing 77-3 at 05:45–05:52. After throwing Smith to the ground, Officer Malone grabbed the back of her neck and yelled, "Stop resisting!" Filing 70-2, Exhibit B at 03:58. Officer Malone continued to grasp the back of her neck for approximately 17 seconds until Smith complied. Filing 70-2, Exhibit B at 04:02–04:19. Officer Malone then placed Smith in handcuffs and checked her for weapons. Filing 70-2 at 04:57–05:25. While being handcuffed, Smith told Storrs, "Don't worry babe, we're going to sue them. Don't worry, they're getting sued." Filing 70-2, Exhibit B at 4:25. After checking Smith for weapons and rolling her over, Officer Malone escorted Smith, still in

11

handcuffs, to the back of a police squad car. Filing 70-2, Exhibit B at 06:10. Smith remarked, "You guys are going to be famous for this." Filing 70-2, Exhibit B at 06:20.

While Officer Malone was attending to Smith, Officer Rozeboom and Sergeant Maas were occupied with Storrs. Filing 70-1, Exhibit B at 08:25. Sergeant Maas again told Storrs that he was being detained, and when Storrs said that he did not do anything, Sergeant Maas said, "Then we're going to get that figured out, but you're not letting us get that—get that chance." Filing 70-1, Exhibit B at 08:30. After being handcuffed and while still on the ground, Storrs repeatedly said that he intended to "sue" the officers. Filing 70-1, Exhibit B at 08:50. Once the officers got Storrs to his feet and walked him toward a squad car, Storrs asked, "Who reported this?" Filing 70-1, Exhibit B at 09:40. When Officer Rozeboom and Sergeant Maas advised him that it was Dick's Sporting Goods and Storrs asked whether they reported seeing him specifically, Officer Rozeboom said, "They described a black male leaving in a silver car." Filing 70-1, Exhibit B at 09:45.

   5.   *Continuation of the Incident with Plaintiffs in the Squad Car*

Although he initially protested, Storrs eventually sat down (still-handcuffed) partway in the back of a police squad car. Filing 70-1, Exhibit B at 10:08. Storrs insisted again that he was not under arrest, and Sergeant Maas advised him that he was "being detained right now." Filing 70-1, Exhibit B at 10:12. Storrs repeated that he was never at Dick's Sporting Goods and Officer Rozeboom replied they would "figure that out" but that Storrs needed to "calm down." Filing 70-1, Exhibit B at 10:22. Sergeant Malone attempted to read Storrs his *Miranda*[4] rights shortly thereafter, but Storrs interrupted him and Sergeant Maas said, "I can't talk to you while we're screaming." Filing 70-1, Exhibit B at 10:45–11:10. Though he initially resisted getting all the way

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

into the squad car, Storrs eventually complied. Filing 70-1, Exhibit B at 11:20–11:35. Sergeant Maas later read Storrs his *Miranda* rights in full, and Storrs decided to speak with Sergeant Maas. Filing 70-3, Exhibit B at 07:45. Storrs adamantly insisted to Sergeant Maas that he did not shoplift anything. Filing 70-3, Exhibit B at 08:30. While the two were speaking, Sergeant Maas informed Storrs that he smelled marijuana coming from him and the car. Filing 70-3, Exhibit B at 10:20. Storrs denied there was anything in the car "that shouldn't be there." Filing 70-3, Exhibit B at 10:25.

A few minutes after being placed in the back of the police car, but while still handcuffed, Smith was read her *Miranda* rights and she exercised her right not to make a statement. Filing 70-1, Exhibit B at 12:50. Moments later, Officer Malone remarked to Officer Rozeboom that he detected "a heavy odor of marijuana." Filing 70-1, Exhibit B at 13:20. Officer Rozeboom responded, "Yeah, I keep getting that smell." Filing 70-1, Exhibit B at 13:25. Thereafter, while speaking to a different officer who arrived on scene, Officer Rozeboom said, "We don't even know if these are our suspects." Filing 70-1, Exhibit B at 13:35. Officer Malone said, "The guy and the car match it . . . ." Filing 70-1, Exhibit B at 13:45. At the request of Officer Rozeboom, a different officer said he would go to Dick's Sporting Goods to get a picture of the suspects. Filing 70-1, Exhibit B at 13:50. A few moments later, another officer asked Officer Rozeboom whether he saw a hat with a pom-pom, but Officer Rozeboom responded, "I did not see it." Filing 70-1, Exhibit B at 14:40. Officer Rozeboom then went back to the car Smith was sitting in and said,

> Dick's Sporting Goods called and gave us a description of a silver car that a black male had just gotten into and had left their store and had gone eastbound towards 72nd Street. The officer that initially stopped you had observed that vehicle leaving the area so you guys were stopped for an investigative stop just to see if you were in fact the shoplifting suspects. That's all we were doing. And then I think you're fully aware of what transpired after that. So that's where we're at. We're trying to figure that out. We are sending an officer over there to see if we can get surveillance

13

footage of whoever was in the store because they had not had a chance to provide
that to us. So we will, uh, we'll get this all sorted out.

Filing 70-1, Exhibit B at 15:15–16:05. Smith requested an ambulance, and one arrived
several minutes later. Filing 70-1, Exhibit B at 16:05, 18:50. Paramedics later removed Smith from
the police car and evaluated her in the ambulance. Filing 70-1, Exhibit B at 22:19.

After Officer Rozeboom finished providing his explanation of what happened to Smith and
Sergeant Maas told Storrs that he smelled the presence of marijuana, Officer Rozeboom, Officer
Malone, and Sergeant Maas all met together along the side of the road. Filing 70-3, Exhibit B at
10:30. Sergeant Maas asked whether they were "confident that this was the car?" Filing 70-3,
Exhibit B at 10:45. Officer Malone initially responded, "It matched [the] description," but then
later added that "the female doesn't match here." Filing 70-3, Exhibit B at 10:50. Officer
Rozeboom answered that the description he had heard was that the suspects were a black female
and a black male. Filing 70-3, Exhibit B at 10:50. Officer Rozeboom informed Sergeant Maas that
a different officer had been sent to Dick's Sporting Goods to see if they could get an image. Filing
70-3, Exhibit B at 10:55.

Sergeant Maas then stated, "We have P.C. to search the car." Filing 70-3, Exhibit B at
11:10.[5] Almost speaking over one another, Officer Malone interjected, "Yeah there is odor of
marijuana," and Sergeant Maas likewise said, "There's odor of marijuana." Filing 70-3, Exhibit B
at 11:11. Sergeant Maas told Officers Malone and Rozebom to search the car to "see if we can find

---

[5] The Court understands "P.C." to be shorthand for "probable cause."

14

any evidence." Filing 70-3, Exhibit B at 11:12. Officer Malone said that he would handle the search and then proceeded to search the vehicle (including a purse located within the vehicle) by himself for approximately three minutes. Filing 70-2, Exhibit B at 14:00–17:35. Upon completing his search, Officer Malone informed Sergeant Maas that he found "nothing" in the vehicle. Filing 70-2, Exhibit B at 17:40. He added, "There's not even paraphernalia or drugs in the vehicle." Filing 70-2, Exhibit B at 17:45. Officer Malone later explained to Storrs that there was an odor of marijuana emanating from his vehicle but that he did not find anything. Filing 70-2, Exhibit B at 24:25. However, when Officer Malone completed his written report following the incident, he wrote that during his search of the vehicle he "located small pieces of marijuana, explaining the odor of marijuana." Filing 70-2, Exhibit A at 2.

   6.  *Clarification of the Description of the Shoplifters*

   Eventually, around 21 minutes after Storrs and Smith were first pulled over, Officer Rozeboom received a call informing him that the suspects were actually four black females in a silver sedan not a black female and a black male in a silver sedan as had initially been reported. Filing 70-1, Exhibit B at 24:08. Within eight minutes after receiving this information, both Smith and Storrs were released from custody. Filing 70-1, Exhibit A at 32:00. Before releasing Storrs, Sergeant Maas told him, "We got bad information. We were wrong. Alright? You're not under arrest. We're going to release you. We'd like you to talk to the ambulance guys and see if they want to talk to you." Filing 70-1, Exhibit A at 31:10. Sergeant Maas then attempted to provide Storrs with a complaint form. Filing 70-1, Exhibit A at 31:30. Storrs drove away in his vehicle while Smith elected to have the ambulance take her to the hospital. Filing 70-1, Exhibit A at 32:50, 36:25. From the time Plaintiffs' vehicle first began braking to pull over along Highway 370 to the

time Storrs was released from handcuffs, less than 30 minutes elapsed. *See* Filing 77-3 at 00:50–30:09.

## B.  Procedural Background

Plaintiffs filed their original Complaint on April 27, 2021. Filing 1. Plaintiffs subsequently filed an Amended Complaint later that same day. Filing 8. Before any of the Defendants submitted an Answer, Plaintiffs filed their Second Amended Complaint on May 18, 2021. Filing 17. Plaintiffs' Second Amended Complaint is the operative Complaint at issue and alleges five distinct counts pursuant to 42 U.S.C. § 1983. Filing 17 at 7–11. Specifically, Plaintiffs claim the following four violations of their rights under the Fourth and Fourteenth Amendments to the United States Constitution: (1) that they were unlawfully detained, (2) that they were unlawfully arrested, (3) that they were subject to excessive force, and (4) that the vehicle they were traveling in on the night in question was unlawfully searched. Filing 17 at 7-9, 10-11. They also allege a related retaliation claim under the First and Fourteenth Amendments to the United States Constitution. Filing 17 at 9-10.

Counts I, II, and V are made by both Plaintiffs against all Defendants and claim violations of the Fourth and Fourteenth Amendments to the United States Constitution. Filing 17 at 7–9; 10–11. Count III is also made by both Plaintiffs and claims violations of the Fourth and Fourteenth Amendments but only names Officer Rozeboom and Sergeant Maas as Defendants; Count III does not allege anything against Officer Malone. Filing 17 at 9. Count IV of the Second Amended Complaint alleges a violation of the First and Fourteenth Amendments and is made by both Plaintiffs against all Defendants. Filing 17 at 9–10.

On May 28, 2021, Defendants filed their respective Answers to Plaintiffs' Second Amended Complaint. Filing 23, Filing 24, Filing 26. On April 29, 2022, a little over a year after

16

Plaintiffs first initiated this action, Defendants collectively moved for summary judgment. Filing 63. Defendants state that their Motion for Summary Judgment is "based on the defense of qualified immunity, and, alternatively, on the merits." Filing 63 at 1. Along with their Motion for Summary Judgment, Defendants filed a supporting brief and submitted a variety of evidence. Filing 67, Filing 68, Filing 70. Plaintiffs filed their brief in opposition to summary judgment on May 31, 2022. Filing 76. Plaintiffs also submitted their own evidentiary materials for consideration. Filing 77, Filing 79. Defendants filed a reply brief and submitted additional evidence on June 15, 2022. Filing 81, Filing 82.

## II.  LEGAL ANALYSIS

### A.  Standards for Summary Judgment on Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Its protection applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). Put differently, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Where the defense of qualified immunity is invoked "[o]n summary judgment, a defendant official is entitled to qualified immunity unless (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th

Cir. 2014) (internal quotation marks omitted). Under this two-pronged inquiry, "courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft*, 563 U.S. at 735. A district court may find for the defendant on either prong, but it "may not deny qualified immunity without answering both questions in the plaintiff's favor." *See Watson v. Boyd*, 2 F.4th 1106, 1112 (8th Cir. 2021) (quoting *Walton*, 752 F.3d at 1116). "As such, a district court 'should [not] deny summary judgment any time a material issue of fact remains on the [constitutional violation] claim [because to do so] could undermine the goal of qualified immunity.'" *Watson*, 2 F.4th at 1112 (quoting *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012) (alterations in original).

With respect to the second prong, a right is clearly established if it is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (alteration in original) (internal quotation marks omitted) (quoting *Ashcroft*, 563 U.S. at 741). The "burden to demonstrate that the law is clearly established" belongs to the plaintiff. *Morgan v. Robinson*, 920 F.3d 521, 524 (8th Cir. 2019). "[T]he longstanding principle" is that "'clearly established law' should not be defined 'at a high level of generality.'" *Id.* at 523 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). Rather, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix*, 577 U.S. at 12 ("The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (quoting *Ashcroft*, 563 U.S. at 742)). "There need not be a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Morgan*, 920 F.3d at 524 (quoting *Ashcroft*, 563 U.S. at 741).

18

On a motion for summary judgment "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019). However, the Supreme Court has indicated that where the events in question are captured on videotape and "[t]here are no allegations or indications that this videotape [is] doctored or altered in anyway, nor any contention that what it depicts differs from what actually happened," a court should view "the facts in the light depicted by the videotape." *See Scott*, 550 U.S. at 378-381.

### B.  Plaintiffs' Individualized Claims

Defendants contend that they are entitled to summary judgment because "there is no genuine issue of material fact, and [they] are entitled to qualified immunity." Filing 67 at 2. To assess the merits of this motion properly, the Court will analyze each of Plaintiffs' specific claims individually.

#### 1.  *Count I - The Unlawful Detention Claims*

Plaintiffs' first claim, by both Plaintiffs against all Defendants, is that Defendants detained them without reasonable suspicion in violation of the Fourth and Fourteenth Amendments. Filing 17 at 7. They allege in their operative Complaint that Officer Malone "effectuated a traffic stop of Storrs and Smith in the absence of reasonable suspicion that they had committed a shoplifting offense at Dick's Sporting Goods, or any other offense" and that each Defendant "continued the

detention after observing Smith and Storrs, at which time any objectively reasonable officer would have determined there was no basis for the detention to continue." Filing 17 at 8. As Plaintiffs make clear in their Brief in Opposition to Summary Judgment, however, "[t]his claim is premised on the Defendant Officers' *initial stop* of Plaintiffs' vehicle." Filing 76 at 18 (citing their own Second Amended Complaint, Filing 17 at 7-8) (emphasis added). Defendants seek summary judgment on this claim.

The issue before the Court on this count is a narrow one. There is no dispute in this case as to whether Plaintiffs were "detained" as that term is understood within the Fourth Amendment context. They were. "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief." *Brendlin v. California*, 551 U.S. 249, 255 (2007) (internal quotation marks omitted); *see also id.* at 251 (noting that during a traffic stop, passengers in the vehicle are "seized as well and so may challenge the constitutionality of the stop"). The only matter in dispute is whether this detention was lawful; that is, whether Defendants had reasonable suspicion—or at least arguable suspicion—to conduct the stop.

a. The Parties' Arguments

Defendants primarily contend that the traffic stop comported with the demands of the Fourth Amendment because it was reasonable based on the reported shoplifting. Filing 67 at 15-17.[6] Specifically, they contend that there was a "particularized and objective basis" for stopping

---

[6] Defendants also argue the stop was justified because Officer Malone witnessed the vehicle commit an independent traffic violation. Because the Court agrees with Defendants' primary argument, it declines to address this alternative position. Defendants argue further that the detention remained reasonable based on the fact that Defendants smelled marijuana. There is no need to address this contention either because, as Plaintiffs make plain in their brief, their unlawful detention claim is limited to the initial stop. *See* Filing 76 at 18. At no point in either their operative Complaint or in their Brief in Opposition to Summary Judgment do Plaintiffs allege that their unlawful detention claim

Plaintiffs' vehicle given the information they received from the Sarpy County dispatchers. Filing 67 at 15; Filing 81 at 11. Defendants note they were advised that the shoplifting suspects were reported to be "a black male and a black female" who were leaving Dick's Sporting Goods and heading "eastbound in a silver four-door sedan." Filing 67 at 15.

Plaintiffs counter by arguing they "did not come close to matching the description broadcasted by the Sarpy County dispatchers" because: (1) Smith is a white woman not a black woman, (2) Plaintiffs were driving in a two-door silver vehicle rather than a four-door silver vehicle as reported by the dispatchers, and (3) although Storrs is a black male, he was not wearing the reported hat with a pom-pom as described by the dispatchers. Filing 76 at 21. In their Reply Brief, Defendants acknowledge that once the traffic stop occurred, "Plaintiffs and the [v]ehicle did not identically match the description provided by dispatchers[.]" Filing 81 at 10. However, relying upon the deposition testimony of Officer Malone, Defendants contend "that there are often discrepancies with reports given by the reporting party, in which the reporting party gives inaccurate or wrong information." Filing 81 at 10. Defendants likewise point to the deposition testimony of Officer Rozeboom for the proposition "that people can change their appearance, such as wearing disguises and makeup or changing the clothing they are wearing." Filing 81 at 10.

b.  Applicable Standards

At the time Plaintiffs were detained, "the law clearly established that a traffic stop must be supported by reasonable suspicion." *Duffie v. City of Lincoln*, 834 F.3d 877, 884 (8th Cir. 2016)

---

is based on the detention taking longer than necessary to serve the purpose of the stop. *See e.g.*, *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) ("[A] police stop exceeding the time needed to handle the matter for which the stop [is] made violates the Constitution's shield against unreasonable seizures"). Because that is not the basis for their unlawful detention claim as pleaded in Count I of their operative Complaint and further given that Plaintiffs make no such argument in their Brief in Opposition to Summary Judgment, Defendants' contention that the detention continued to remain lawful given the smell of marijuana is inapposite to the dispute.

21

(citing *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). Moreover, "the contours of [Plaintiffs']

right to be free from a governmental seizure absent reasonable suspicion were sufficiently clear."

*Duffie*, 834 F.2d at 884 (citing *Anderson*, 483 U.S. at 640). "The Fourth Amendment permits brief

investigative stops—such as the traffic stop in this case—when a law enforcement officer has 'a

particularized and objective basis for suspecting the particular person stopped of criminal

activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449

U.S. 411, 417-18 (1981)). While law enforcement officers are permitted to "'conduct a brief,

investigatory stop'—what we call a '*Terry*[7] stop'—'when the officer has a reasonable, articulable

suspicion that criminal activity is afoot[,]" such investigatory detentions nevertheless remain

tempered by and subject to Fourth Amendment scrutiny. *See Haynes v. Minnehan*, 14 F.4th 830,

835 (8th Cir. 2021). Again, this is because "[a] traffic stop for a suspected violation of law is a

'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the

Fourth Amendment." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). However, the Supreme

Court has also expressly held that "an officer making a traffic stop may order passengers to get out

of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

"In determining whether an officer possessed reasonable suspicion to conduct a temporary

investigative detention . . . courts look only at the information the officer possessed at the time."

*Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019). Even if "an officer lacked reasonable

suspicion and thus conducted an unlawful [*Terry*] stop, she may nonetheless be entitled to qualified

immunity if she had *arguable* reasonable suspicion—that is, a reasonable officer in the same

position could have believed she had reasonable suspicion." *Id.*; *see also De La Rosa v. White*, 852

---

[7] *Terry v. Ohio,* 392 U.S. 1 (1968).

F.3d 740, 745-46 (8th Cir. 2017) (concluding that a law enforcement officer was "entitled to qualified immunity if a reasonable officer could have believed he had reasonable suspicion; in other words, if he had arguable reasonable suspicion"). Whether an "officer's conclusion was reasonable, or whether he was 'reasonably unreasonable' for purposes of qualified immunity, are questions of law not fact." *Kelsay v. Ernst*, 933 F.3d 975, 981 (8th Cir. 2019) (internal citation omitted). Thus, "[t]hey are matters for resolution by the court, not by a jury." *Id.*

### c.   The Defendants Are Entitled to Qualified Immunity

The Court concludes there was at least "arguable reasonable suspicion" to detain Plaintiffs because "a reasonable officer in the same position could have believed [there was] reasonable suspicion." *Waters*, 921 F.3d at 736. After giving due consideration to the totality of the circumstances, the Court is not persuaded by Plaintiffs' contention that they "did not come *close* to matching the description broadcasted by the Sarpy County dispatchers[.]" Filing 76 at 21 (emphasis added). In fairness, there were some discrepancies between the reported suspects and Plaintiffs. Chief among these is the fact that Smith is white and the reported female suspect was black. Indeed, when Sergeant Maas asked Officer Rozeboom and Officer Malone whether they were confident they had the right vehicle after the fact, Officer Malone said that the vehicle "matched [the] description" but then also noted "the female doesn't match here." Filing 70-2, Exhibit B at 13:50–14:10. Plaintiffs are also correct that Storrs's car was a two-door vehicle rather than the reported four-door vehicle and that Storrs was not wearing a hat with a "pom-pom."

These discrepancies notwithstanding, Plaintiffs' position is ultimately undermined by the other surrounding circumstances which gave rise to reasonable suspicion—or at the very least arguable reasonable suspicion—when viewed in their totality. *Waters*, 921 F.3d at 736. First, even if Smith did not match the description of the female shoplifter, Storrs did (save for the lack of a

23

hat with a pom-pom). He was a black male heading eastbound in a silver car close to Dick's Sporting Goods.[8] Both parties agree that when this call came through, "Officer Malone was at 72nd and Towne Center Parkway" and "observed what he thought was a silver four-door sedan . . . near Dick's, driven by a black male with someone seated in the passenger seat as it turned left (north) onto 72nd Street." *See* Filing 67 at 3 (¶¶6–7); Filing 76 at 4 (¶¶6–7). Plaintiffs' operative Complaint does not suggest that Officer Malone realized Smith was white until after he had already pulled them over and approached the vehicle. *See* Filing 17 at 3–4 (¶¶9–22).

As for the discrepancy in the type of silver car Storrs was driving, Plaintiffs admit that before Officer Malone pulled over Storrs, Officer Malone "thought" that Storrs's vehicle had four doors instead of two. *See* Filing 67 at 3 (¶7); Filing 76 at 4 (¶7) Accordingly, there is no dispute that before Officer Malone pulled Storrs over he believed Storrs was driving a four-door silver sedan, just as had been reported by dispatch. In other words, Plaintiffs do not question the sincerity of Officer Malone's initial belief regarding the number of doors he thought Storrs's vehicle had.

Based upon the evidence provided by both parties, the Court also concludes that Officer Malone's subjective belief was not objectively unreasonable. *See Kelsay*, 933 F.3d at 981 (whether an officer's conclusion was "reasonable" or "reasonably unreasonable" for qualified immunity purposes is a question of law, not a question of fact for a jury). Officer Malone's dash camera footage shows (1) it was very dark out at the time, (2) while waiting to turn onto 72nd Street, Officer Malone was positioned behind Storrs such that it would not have been easy for him to see how many doors the vehicle had, (3) there was another vehicle in between Officer Malone's patrol

---

[8] Plaintiffs' proximity to Dick's Sporting Goods is apparent from Officer Rozeboom's body camera footage. It took Officer Rozeboom less than one minute and 15 seconds to drive from the Dick's Sporting Goods Parking lot to the spot along Highway 370 where Plaintiffs were pulled over. *See* Filing 70-1, Exhibit B at 02:15–03:30.

car and Storrs's vehicle, which would have prevented Officer Malone from getting a closer look at Storrs's vehicle while both vehicles waited to turn east onto Highway 370, and (4) Storrs's vehicle was of the type that—especially from a distance and at night—could reasonably be mistaken for a four-door sedan rather than a two-door coupe. *See* Filing 77-3 at 0:00–01:15. Moreover, the fact that a different officer (Officer Rozeboom) did not realize this was a two-door vehicle until after he got out of his car and walked past its rear bumper supports the objective reasonableness of Officer Malone's mistake. *See* Filing 67 at 4 (¶18); Filing 76 at 6 (¶18) (Plaintiffs admitting as fact that "[w]hen Officer Rozeboom got past the rear bumper of the Vehicle, he noticed that the Vehicle was a two-door, not a four-door sedan").

All told, Plaintiffs do not question that, at least initially, Officer Malone subjectively believed the vehicle had four doors. For the reasons discussed above, this sincere but mistaken belief was not objectively unreasonable under the circumstances. Because "a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake[,]" *Heien*, 574 U.S. at 57, the fact that Storrs was driving a two-door rather than a four-door vehicle did not automatically vitiate the reasonableness of the initial stop, especially in light of the other circumstances giving rise to at least arguable reasonable suspicion.

Furthermore, it is true that Storrs was not wearing a hat with a pom-pom at the time he was pulled over. Nevertheless, the mere wearing of a hat is hardly the type of immutable characteristic that would have immediately suggested to a reasonable officer that they had the wrong man. It takes little effort to remove and conceal a hat even while driving in a car. *Cf. United States v. Quinn*, 812 F.3d 694, 699 n.2 (8th Cir. 2016) (noting that the district court "reasonably credited" the officer's explanation "that a sweatshirt easily could be discarded by a fleeing suspect . . . ."). Here, Defendants have offered Officer Rozeboom's deposition testimony stating that "people can

25

change their appearance, people can change their clothing they are wearing, they can have disguises on." Filing 82-1, Exhibit C at 45:23-25. The fact that Storrs was not wearing a hat when Officer Malone pulled him over did not fatally undermine his reasonable suspicion.

This case of mistaken identity is a far cry from what the Eighth Circuit Court of Appeals considered in *Duffie*, 834 F.3d at 881. There, a law enforcement officer detained a 58-year-old, bald, white man driving "an older maroon Chevrolet Astro Van . . . with light colored stripes down the side" over three hours after witnesses had reported "strange" behavior on the part of two black men in their late teens or early twenties, both with hair, in "an early 90s Astro style van . . . [that was] maroon with white stripes down the side." *Id*. at 879. In denying qualified immunity to the detaining officer, the Eighth Circuit first observed that the officer improperly "relied on an incident report that did not contain information sufficient to create reasonable suspicion that [the plaintiff] had already, was, or about to commit a crime." *Id*. at 883. That is, the "strange" behavior that had been reported (the brandishing of a handgun in public near a convenience store), was not technically a crime in the first place. *See id.* Moreover, even accounting for the fact it was dark at the time, the Eighth Circuit concluded that "an objectively reasonable police officer would not mistake a 58-year-old bald man for a young adult with hair." *Id*. at 844.

Here, by contrast, there is no contention that Defendants lacked cause to investigate a reported theft in progress. *See* Filing 76 at 3 (¶2) (Plaintiffs admitting as fact that "[a]t approximately 1850 hours on December 26, 2019 Officers Rozeboom and Malone were dispatched to Dick's Sporting Goods . . . for a shoplifting/theft in progress call"). Defendants were alerted to facts that, if true, constituted an actual crime. In further contrast to *Duffie*, the officers in this case initiated their traffic stop within mere minutes of the call coming through and they did so quite close to where the crime allegedly occurred. Officer Malone did not pull over a silver vehicle hours

later while patrolling some random neighborhood in the City of Papillion; he pulled over a silver vehicle after watching it exit the shopping center near Dick's Sporting Goods within moments of receiving the report of shoplifting at that store from the Sarpy County dispatcher. *See Chestnut v. Wallace*, 947 F.3d 1085, 1091 (8th Cir. 2020) ("We think that officers should generally be allowed to believe the information that they receive from or through a dispatcher, even if it later turns out that the facts as relayed are disputed or even untrue, and that that information alone can sometimes justify a detention").

Finally, the discrepancies between the reported suspects and the driver in *Duffie* are less egregious in this case. There, the officers were told to be on the lookout for two black men with hair in their late teens or early twenties; yet, the officer pulled over a bald, white man in his late fifties. Here, officers were advised that the shoplifting suspects consisted of a black male and a black female in a four-door, silver car. It is true that Plaintiffs did not perfectly match this description, but the discrepancies here were not as patent as in *Duffie*—particularly when considering Plaintiffs' close temporal and geographic nexus to the reported crime. *See Irvin v. Richardson*, 20 F.4th 1199, 1205 (8th Cir. 2021) (citing "numerous Eighth Circuit decisions concluding that a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion") (internal quotation marks omitted). Here, both parties agree that Officer Malone observed a silver vehicle near Dick's Sporting Goods that was being "driven by a black male with someone seated in the passenger seat as it turned left (north) onto 72nd Street." Filing 67 at 3 (¶7); Filing 76 at 4 (¶7).

In this sense, Plaintiffs' arguments fail for the same reasons that they did when they were raised by the criminal defendant in *Quinn*, 812 F.3d at 697. There, the Eighth Circuit concluded that the officer had reasonable suspicion to conduct a *Terry* stop despite the defendant's arguments

27

that he was wearing different clothing than any of the reported suspects and "his similarity to the suspects' traits—being white and male—was not sufficient to support reasonable suspicion." *Quinn*, 812 F.3d at 698. Explaining that "[t]he fatal flaw in Quinn's approach is that he challenges the sufficiency of each factor in isolation from the rest[,]" the Eighth Circuit categorically rejected such a "divide-and-conquer analysis" for disputing reasonable suspicion. *Id.* There, as here, the responding officer "relied on a relatively generic suspect description—one which [the individual being detained] did not match perfectly[.]" *Id.* at 699. However, much like Officer Malone in this case, the officer in *Quinn* had reasonable suspicion based on proximity to the crime scene. *Id.* at 698.

Indeed, the temporal and geographic bases for reasonable suspicion are even stronger in this case than they were in *Quinn*. In *Quinn*, the defendant argued that Eighth Circuit precedents "relying on the suspects' proximity to the crime scene [were] inapposite because those cases involved much shorter periods of time between the commission of the crimes and the officers' detention of the suspects." *Quinn*, 812 F.3d at 698. The Eighth Circuit rejected this argument and said, "[W]e do not think that the forty-minute gap between the crime and [the defendant's] sighting undermined [the officer's] reasonable suspicion." *Id.* at 699. Here, Plaintiffs were pulled over within mere minutes after the Sarpy County dispatchers reported that the suspects were leaving the scene. Thus, the stop was much closer in time to the report than in *Quinn*, thereby falling within the very class of cases the defendant in *Quinn* sought to distinguish. *See id.* at 698 (citing *United States v. Juvenile TK*, 134 F.3d 899, 904 (8th Cir 1998), as "affirming denial of suppression motion where arresting officer stopped defendant within five minutes of receiving dispatch and within two blocks of the crime scene," and *United States v. Walker*, 771 F.3d 449, 450 (8th Cir. 2014), as

28

"holding that officer had reasonable suspicion to stop defendant based on dispatch stating that similar vehicle had been involved in shooting one minute earlier, three blocks away").

Moreover, because *Quinn* is a criminal case the relevant question was limited to whether the officer had reasonable suspicion. This case is a civil § 1983 action. Therefore, Defendants prevail based on qualified immunity so long as there was at least arguable reasonable suspicion. *De La Rosa*, 852 F.3d at 745-46. Defendants were operating off more than a mere hunch and could point to a number of specific and articulable bases for why they initially detained Plaintiffs (including the similarity of the vehicle, similarity of Storrs to one of the reported suspects, the fact Plaintiffs were in the immediate vicinity of the reported crime at the time, and the fact that they were heading in the same direction as had been reported). Thus, there was at least arguable reasonable suspicion justifying the initial investigatory stop. Again, Plaintiffs make clear in their brief that their unlawful detention claim only challenges the "initial" stop. *See* Filing 76 at 18 ("This claim is premised on the Defendant Officers' *initial stop* of Plaintiffs' vehicle.") (citing their own Second Amended Complaint, Filing 17 at 7-8) (emphasis added).

The Court concludes that when considering the totality of the circumstances, rather than looking at each individual factor in isolation, Defendants at least had arguable reasonable suspicion because "reasonable officer[s] in the same position could have believed [they] had reasonable suspicion" to detain Plaintiffs. *Waters*, 921 F.3d at 736. The existence of arguable reasonable suspicion entitles Defendants to qualified immunity under the second prong of the qualified immunity analysis. *See De La Rosa*, 852 F.3d at 745-46 (examining arguable reasonable suspicion under the "clearly established" prong of qualified immunity). The Court grants Defendants' Motion for Summary Judgment in their favor on Count I of Plaintiffs' Second Amended Complaint

for this reason. *See Watson*, 2 F.4th at 1112 (noting a court can address the prongs in any order, but that it cannot deny qualified immunity unless both prongs are answered in the plaintiff's favor).

### 2. Count II - The Unlawful Arrest Claims

In addition to their unlawful detention claims, Plaintiffs separately allege that they were not just detained but were also "arrested" on the night of December 26, 2019. Specifically, Count II of their operative Complaint alleges that Defendants arrested Plaintiffs without probable cause, in violation of the Fourth and Fourteenth Amendments. Filing 71 at 8. Like their unlawful detention claims in Count I, these claims are also brought by both Plaintiffs against all Defendants.

#### a. The Parties' Arguments

Defendants dispute that an "arrest" occurred in the first place. They maintain that Plaintiffs were only detained, not arrested. *See* Filing 67 at 17. Defendants point to the fact that Plaintiffs' own operative complaint states that neither Plaintiff was "cited or arrested for any offense relating to the police encounter on December 26, 2019." Filing 17 at 7 (¶43); *see also* Filing 81 at 14. Defendants further argue that even if Plaintiffs were arrested, Defendants would still be entitled to qualified immunity because such an arrest was supported by arguable probable cause. Filing 67 at 17. Plaintiffs counter by arguing that "even if this was initially an investigative detention, it became a *de facto* arrest when Defendant Officers used unreasonable force against Plaintiffs." Filing 76 at 25. In support of their *de facto* arrest theory, Plaintiffs point to six factors for consideration:

> (1) Officer Malone approached their vehicle with his firearm unholstered; (2) [Storrs] was ordered out of the vehicle; (3) [Storrs] was told to put his hands behind his back; (4) [Storrs] was tased in the genitals; (5) [Storrs] and [Smith] were both placed in handcuffs and put in the back of separate police cars; and (6) both Plaintiffs were [*Mirandized*].

Filing 76 at 27. Plaintiffs also argue that "Defendants, at a minimum, conducted a *de facto* arrest upon Mr. Storrs and Ms. Smith when they exercised excessive force against [them] . . . ." Filing 76 at 27.

Accordingly, the question here is not limited to whether there was probable cause or arguable probable cause to effectuate an arrest. There is a threshold question as to whether Plaintiffs were actually "arrested" in the first place. This latter question is a dispute of law not fact. *See United States v. Tovar-Valdivia*, 193 F.3d 1025, 1027 (8th Cir. 1999) ("Whether a particular seizure amounted to an arrest is a question of law that this court reviews de novo"). Plaintiffs are mistaken when they suggest in their brief that whether their detention evolved into an arrest presents a question of fact that should be viewed in the light most favorable to them. *See* Filing 76 at 27. Their contention is also belied by contradictory positions they took previously. Indeed, when Defendants requested that Plaintiffs admit they were not arrested in discovery, Plaintiffs objected to this request for admission on the basis that it "call[ed] for a legal conclusion." Filing 68-1, Exhibit C at 1; Filing 68-1, Exhibit D at 1. As a question of law, this Court must answer the threshold question of whether the undisputed seizure of Plaintiffs remained a *Terry* stop at all times, or whether it eventually evolved past a detention and morphed into an "arrest." If Plaintiffs were never truly "arrested" then this is necessarily fatal to their unlawful "arrest" claims.

     b.  Applicable Standards

"[T]he arrest of a person is quintessentially a seizure." *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980) (internal quotation marks omitted)). "If a seizure escalates into an arrest, the next question is whether the arrest was supported by probable cause." *Robbins v. Youngblut*, No. 418CV00289SMRSBJ, 2022 WL 3444885, at *5 (S.D. Iowa Aug. 4, 2022). In a § 1983 action, "an officer is entitled to qualified

immunity if there is at least 'arguable probable cause.'" *Garang v. City of Ames*, 2 F.4th 1115, 1121 (8th Cir. 2021). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011); *see also Copeland v. Locke*, 613 F.3d 875, 880 (8th Cir. 2010) ("In the wrongful arrest context, officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the mistake is objectively reasonable.").

"There is no bright line of demarcation between investigative stops and arrests." *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013) (quoting *United States v. Miller,* 974 F.2d 953, 957 (8th Cir.1992)). Nor is there a "clear line between investigative stops and *de facto* arrests." *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016). Perhaps the Eighth Circuit Court of Appeals put it most simply when it explained, "When an officer exceeds *Terry*'s scope, the investigative detention transforms into an arrest." *Pollreis v. Marzolf*, 9 F.4th 737, 744 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 904 (2022).

However, the Eighth Circuit has "provided several factors to consider in determining whether an investigative stop became an arrest[.]"*Id.* at 745. They are:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Pollreis*, 9 F.4th at 745 (quoting *United States v. Raino*, 980 F.2d 1148, 1149-50 (8th Cir. 1992)).

32

c.   Plaintiffs Were Not "Arrested" on December 26, 2019

As noted above, Plaintiffs concede they were not "cited or arrested for any offense relating to the police encounter on December 26, 2019." Filing 17 at 7 (¶43). Their claim turns on whether this was a "*de facto*" arrest. The Court agrees with Defendants that neither Storrs nor Smith was "arrested" on the night in question as a matter of law. This fundamentally undoes Plaintiffs' unlawful arrest claims.

i.   Under the Totality of the Circumstances, the Relevant
Factors Show No *De Facto* Arrest

The Court begins by considering the five factors recently reiterated by the Eighth Circuit in *Pollreis*, 9 F.4th at 745. Taken in isolation, the first two factors—(1) the number of officers and police cars involved, and (2) the nature of the crime and whether there was reason to believe that Storrs and Smith might be armed—would at first seem to weigh in favor of finding a *de facto* arrest. As to the first factor, there were initially two officers on scene, but several more arrived later before Plaintiffs were placed in handcuffs, which reasonably suggests arrest, not simply investigatory detention. As to the second factor, Plaintiffs were detained to investigate an alleged shoplifting incident, which is ordinarily a non-violent offense, and there is no evidence that Defendants had any reason to believe either Plaintiff was armed.

The third factor—the strength of the officers' articulable, objective suspicions, *Pollreis*, 9 F.4th at 745—is largely inapposite to this set of circumstances. Defendants did not exert physical force against Plaintiffs or place them in handcuffs at the onset of the detention; they took these actions after Plaintiffs repeatedly refused to comply with other directives. Thus, the Court turns to the remaining factors.

33

The Court finds that the fourth and fifth factors of the analysis (*i.e.*, Plaintiffs' erratic behavior and the need for Defendants to take immediate action), weigh heavily in Defendants' favor under the totality of the circumstances. *Pollreis*, 9 F.4th at 745. Defendants' attempt to conduct a brief investigative detention was frustrated by Plaintiffs' behavior. Again, Defendants did not immediately resort to handcuffs and tasers simply to subdue a suspected shoplifter; those means were utilized in response to how Plaintiffs reacted along a dark roadside after being detained.

The Eighth Circuit has recognized that officers are required to use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop[.]" *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010). Nevertheless, "[a]s part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of a stop." *Sanford*, 813 F.3d at 713. Thus, "[w]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Id.* (internal quotation marks omitted). As to whether the use of handcuffs is justified during an investigative stop, the Eighth Circuit has said, "[T]he Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *Pollreis*, 9 F.4th at 745 (alteration and internal quotation marks omitted). On the other hand, unless there is a concern for safety, handcuffing is not consistent with a *Terry* stop. *See Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) ("We have already held that handcuffing 'absent any concern for safety' violates the second *Terry* prong"). The Eighth

Circuit has also "held that using handcuffs can transform an investigative stop into a *de facto* arrest, but [it] does not always do so." *Id.*

For example, in *El-Ghazzaway v. Berthiaume*, 636 F.3d 452 (8th Cir. 2011), the Eighth Circuit held that the use of handcuffs transformed a *Terry* stop into a *de facto* arrest for the following reasons: "(1) the officer had no indication that the man was dangerous, (2) the suspected crime did not involve a weapon, (3) the man did not act suspiciously, (4) the officer failed to conduct any investigation before handcuffing the suspect, and (5) there were no exigent circumstances." *Pollreis*, 9 F.4th at 745–46 (citing *El-Ghazzaway*, 636 F.3d at 457–58). In contrast, in *Waters v. Madson*, 921 F.3d 725 (8th Cir. 2019), the Eighth Circuit "held that handcuffing and placing a non-compliant individual in a squad car for twenty minutes was not a *de facto* arrest." *Pollreis*, 9 F.4th at 746 (citing *Waters*, 921 F.3d at 738). Likewise, in *Chestnut v. Wallace*, 947 F.3d 1085 (8th Cir. 2020), the Eighth Circuit "held that handcuffing a mostly compliant individual for twenty minutes was not a *de facto* arrest, even after police frisked the individual and found no weapons." *Pollreis*, 9 F.4th at 746 (citing *Chestnut*, 947 F.3d at 1088).

With respect to the fourth factor—*i.e.*, the erratic behavior or suspicious movements by the persons under observation, *Pollreis*, 9 F.4th at 745—Plaintiffs exhibited behavior that was both very uncooperative and erratic. For example, when Officer Malone directed Storrs to get out of the vehicle, Storrs told him, "I'm not doing shit. I ain't getting out of the fucking car, you racist piece of shit." Filing 70-2, Exhibit B at 01:50–01:58; Filing 67 at 6. Moments later, however, Storrs exited the vehicle without being specifically told to do so. Filing 70-2, Exhibit B at 02:55. Smith also exhibited erratic behavior by spontaneously hopping over the center console of the vehicle and following Storrs as he exited the driver's side door on the side near passing traffic. Filing 70-2, Exhibit B at 03:07. Coupled with their repeated refusals to obey law enforcement directives,

35

their argumentative nature (and in Smith's case, active physical resistance), this factor strongly weighs in favor of finding that Defendants were entitled to take more severe actions while still staying within the scope of *Terry*.

The fifth and final factor is the need for immediate action by the officers and the lack of opportunity to have made the stop in less threatening circumstances. *Pollreis*, 9 F.4th at 745. Of all the factors, this one weighs most heavily in Defendants' favor. The video footage shows that Defendants did not immediately resort to physical restraint, handcuffs, and using a taser. It shows that Defendants initially and repeatedly attempted to get Plaintiffs to cooperate through lesser means. Plaintiffs refused. Storrs was told to place his hands behind his back approximately five minutes into the encounter after he exited the vehicle, but he ultimately refused to do so. Even before being told to put his hands behind his back, Storrs had already refused to comply with previous directives. *See e.g.*, Filing 70-2, Exhibit B at 00:28 (Officer Malone telling Storrs to turn off his vehicle and Storrs responding "I'm not doing shit"); Filing 70-2, Exhibit B at 01:45–01:58 (Officer Malone telling Storrs for a second time to turn off his vehicle and Storrs responding "I'm not doing shit. I ain't getting out of the fucking car, you racist piece of shit"). Storrs was also tased in response to circumstances that developed during the course of the stop; Plaintiffs do not point to anything showing that Storrs was tased simply because he was suspected of shoplifting.

After Smith physically resisted Sergeant Maas's grip and Storrs was tased there was a need for immediate action particularly as all this occurred immediately next to a dark highway. Plaintiffs were not placed in handcuffs until they repeatedly refused to comply with the directions of law enforcement. In fact, when Storrs insisted that he had done nothing wrong while being handcuffed, Sergeant Maas said, "Then we're going to get that figured out, but you're not letting us get that— get that chance." Filing 70-1, Exhibit B at 08:30. Moreover, Plaintiffs repeatedly refused to comply

with law enforcement despite being outnumbered by them. So, while the first factor (*i.e.*, the number of officers involved) may at first seem to support Plaintiffs' position, when consideration is given to the fact that Plaintiffs continued to exhibit increasingly uncooperative behavior in the face of a growing law enforcement presence, this consideration actually cuts against finding that a *de facto* arrest occurred. Giving due consideration to each of the five factors, the Court finds that neither Plaintiffs' detention was transformed into a "*de facto*" arrest.

ii. The Court is Not Persuaded by the Factors Plaintiffs Identify for Consideration

Plaintiffs do not discuss the five-factors addressed above in their brief. They instead direct the Court to six different considerations in support of their *de facto* arrest theory. *See* Filing 76 at 27). Even if these factors governed the analysis, the Court is not persuaded that they alter it.

The first factor Plaintiffs point to is that when Officer Malone approached the vehicle to investigate a reported shoplifting, he already had his firearm unholstered. Filing 76 at 27. This consideration essentially goes to the second factor identified in *Pollreis*, 9 F.4th at 745, (*i.e.*, the nature of the crime and whether there is reason to believe the suspect might be armed). Although the Court previously noted that this factor weighed in favor of finding a *de facto* arrest, under the totality of the circumstances it does not overcome the other factors that support a contrary conclusion. Viewing the evidence in the light depicted by the video, *Scott*, 550 U.S. at 381, Officer Malone never moved his firearm away from his leg and did not point it any direction other than down toward the ground. Filing 77-3 at 1:08–4:56. So while Officer Malone did have his firearm unholstered, it at all times remained immediately adjacent to his holster and was never pointed at anyone. The video also shows that immediately after Storrs exited the vehicle, Officer Malone put his firearm back in his holster. Filing 77-3 at 4:52. Plaintiffs do not cite any authority suggesting

that an officer exceeds *Terry*'s scope by holding his firearm next to his holster while keeping it pointed down during a roadside stop, particularly at night on a dark highway.

The second factor Plaintiffs identify (*i.e.*, that Storrs was ordered out of the vehicle), does not alter the analysis at all. In *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977), the Supreme Court determined that once a vehicle is lawfully detained, law enforcement may order the driver out of the vehicle while still staying within the scope of *Terry*. The Court also already considered the Plaintiffs' third factor (*i.e.*, that Storrs was told to put his hands behind his back) and fourth factor (*i.e.*, that Storrs was tased) and concluded that Defendants were justified in taking these actions based on Plaintiffs' erratic behavior and movements and the need for immediate action. *Pollreis*, 9 F.4th at 745. The fifth and sixth considerations Plaintiffs offer are: "(5) [Storrs] and [Smith] were both placed in handcuffs and put in the back of separate police cars; and (6) both Plaintiffs were [*Mirandized*]. Filing 76 at 27. These facts merit further discussion, but they do not alter the Court's conclusion.

Though "most *Terry* stops do not trigger [a] detainee's *Miranda* rights[,]" *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003), the fact that Plaintiffs were *Mirandized* does not mean they were "arrested" under the law. The Supreme Court emphasized mere months ago that a *Miranda* violation is itself not a constitutional violation. *See Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022) ("*Miranda* did not hold that a violation of the rules it established necessarily constitute a Fifth Amendment violation, and it is difficult to see how it could have held otherwise"); *id.* at 2108 ("a violation of *Miranda* is not itself a violation of the Fifth Amendment"). Instead, "*Miranda* impose[s] a set of prophylactic rules." *Id.* It would, therefore, be illogical to make a legal determination implicating application of the Fourth Amendment based solely upon whether a prophylactic warning aimed at ensuring compliance with the Fifth Amendment has been

38

administered. This is especially true when the failure to give such a prophylactic warning is not itself a constitutional violation. Put differently, Fourth Amendment dictates are not governed by the application of Fifth Amendment prophylactics.

The Court also finds the Eighth Circuit's decision in *United States v. Martinez*, 462 F.3d 903 (8th Cir. 2006), to be instructive in this regard. There, the court stated that whether an individual is "'in custody' for purposes of *Miranda* after being handcuffed during [a] *Terry* stop is a separate question from whether that handcuffing constituted an arrest for which probable cause was required." 462 F.3d at 908. In addition to *Martinez*, several other Eighth Circuit cases have declined to find that an individual was arrested simply because he was handcuffed. *See id.* at 907 (compiling cases); *see also Sanford*, 813 F.3d at 714 (concluding that an investigative stop "did not amount to a *de facto* arrest" because under the totality of the circumstances it was reasonable for a law enforcement officer "to draw his weapon, order [the suspect] out of the vehicle, detain [him] in handcuffs, and sweep the passenger seat of the vehicle for weapons").

The *Martinez* court rejected a criminal defendant's claim that he was arrested without probable cause when he was placed in handcuffs, placed in a patrol car, and transported to a crime scene in order to effectuate a "show-up identification." *Martinez*, 462 F.3d at 907. It concluded that placing the defendant in handcuffs "was a reasonable response to the situation in order to protect the officers' personal safety and to maintain the status quo. As such, the use of handcuffs did not convert this *Terry* stop into an arrest." *Id.* The court similarly concluded that the fact the defendant was placed in a patrol car and transported to the scene of the crime did not transform the stop into an arrest. *Id.* at 908. Instead, it determined, that "the exigencies were such that the officers could not dispel their suspicions that had prompted the *Terry* stop until they transported [the suspect] back to the [scene] for the show-up identification." *Id.* Therefore, while the Eighth

39

Circuit did find that the defendant was entitled to *Miranda* warnings because he was "in custody," simply being in "custody" for purposes of *Miranda* did not mean that he had been "arrested." *Id.* at 908–910.

Plaintiffs were subdued, placed in handcuffs, and placed in police cars after they both got out of the vehicle and refused to comply with a number of different directives right next to a dark and busy highway. In Smith's case, she not only refused to comply with verbal directives, she also physically resisted Sergeant Maas's attempt to move her away from Storrs. In *Martinez*, the Eighth Circuit concluded that transporting the defendant in a squad car to a different scene did not transform the nature of the stop into an arrest. *Id.* Here, Plaintiffs were not taken anywhere, much less to a police station or jail. *See Hayes v. Florida*, 470 U.S. 811, 816 (1985) (concluding that a seizure in which "the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes" would be sufficiently like an arrest at least in the absence of judicial supervision). Therefore, just because Plaintiffs were *Mirandized* does not mean they were arrested.

### iii. The Length of Plaintiffs' Detention Did Not Transform This Investigative Stop into a *De facto* Arrest

Plaintiffs do not directly argue that the length of their detention transformed this investigatory stop into a *de facto* arrest. The closest they come in their brief is where they state that, "the facts demonstrate Defendant Officers' continued detention of Plaintiffs constituted an arrest." Filing 76 at 27. Plaintiffs then cite case law for the proposition that during an investigatory detention, officers "should be diligent and employ the least intrusive means of detention, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the temporary

40

seizure." Filing 76 at 27 (quoting *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) (internal quotation marks omitted)). However, at no point do Plaintiffs contend that this detention became a *de facto* arrest because Defendants were dilatory. The Court will not find a *de facto* arrest occurred based on a claim Plaintiffs do not expressly make; they have waived this argument. *See Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020), *cert. denied*, 141 S. Ct. 894 (2020) ("The failure to oppose a basis for summary judgment constitutes waiver of that argument") (internal quotation marks omitted).

Even if the Court were to construe Plaintiffs' vague hints in their brief to be making such an argument, the Court would still find it to be without merit. The length of Plaintiffs' detention was directly tied to the time it took for Defendants to contain the unruly situation that had developed and to "dispel their suspicions that had prompted the *Terry* stop" in the first place. *See Martinez*, 462 F.3d at 908. "Determining whether the duration of a specific seizure is reasonable is a fact-intensive question, and there is no *per se* time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *Saunders v. Thies*, 38 F.4th 701, 712 (8th Cir. 2022) (internal quotation marks omitted). In *Waters*, the Eighth Circuit found "no unreasonable delay" giving rise to a *de facto* arrest claim where video evidence showed that:

> The entire encounter with law enforcement lasted about 20 minutes, that officers worked diligently to complete their investigation, and that the encounter only lasted as long as it did because [the plaintiff] was argumentative and refused to cooperate with the police investigation by failing to obey legitimate requests to identify himself and step out of his vehicle.

*Waters*, 921 F.3d at 737.

Much of the same can be said about this case. From the time Plaintiffs' vehicle first began braking to pull over along Highway 370 to the time Storrs was released from handcuffs, less than 30 minutes elapsed. *See* Filing 77-3 at 00:50–30:09. Moreover, from the time Defendants first learned that they had the wrong suspects, it took less than eight minutes to release both Plaintiffs from handcuffs. During those intervening minutes, Defendants did not unduly delay.

The video footage from that night shows that after Defendants learned they had the wrong suspects, Sergeant Maas told Officer Rozeboom that he was going to "uncuff" Storrs once he got a "records check back on him" and that Officer Rozeboom should do the same with Smith. Filing 70-1, Exhibit B at 27:20. Officer Rozeboom then went to the ambulance where Smith was being treated and proceeded to take off her handcuffs. See Filing 70-1, Exhibit B at 27:40–28:35. In total, from the time Officer Rozeboom first learned that they were looking for different suspects (Filing 70-1, Exhibit B at 24:23) to the time he took off Smith's handcuffs (Filing 70-1 at 28:34), a little over four minutes passed.

It took a little over seven minutes to remove Storrs's handcuffs once Defendants learned he was not a suspect. Filing 70-3, Exhibit B at 17:00–24:10. In those seven or so minutes, Sergeant Maas requested a "records check" for Storrs over the radio. Filing 70-3, Exhibit B at 18:08. He then walked over to a paramedic and informed him that they would soon be releasing Storrs, and said "he needs to be checked out." Filing 70-3, Exhibit B at 19:00. After coordinating with the paramedic and Officer Rozeboom to discuss what to do about Smith, Sergeant Maas then began filling out a "complaint form" to provide to Storrs. Filing 70-3, Exhibit B at 20:07–22:06. Once Sergeant Maas completed filling out part of the complaint form, he advised Officer Malone of what they had learned. Filing 70-3, Exhibit B at 22:30. Sergeant Maas then completed filling out

42

the complaint form and let Storrs out of the vehicle so that they could take his handcuffs off and give him the complaint form. Filing 70-3, Exhibit B at 23:00–23:40.

As in *Waters*, Plaintiffs' encounter with law enforcement "only lasted as long as it did because [they] refused to cooperate with the police investigation by failing to obey legitimate requests . . . ." Their behavior unnecessarily prolonged the scope and duration of the stop. Defendants acted with reasonable diligence and promptness in concluding the detention once they became aware that Plaintiffs were not their suspects. The Court concludes that Plaintiffs waived this argument by not directly making it in their brief. Irrespective of waiver, the Court would not find such an argument to be persuasive.

        iv. Plaintiffs' Detention Remained within *Terry's* Scope Given Legitimate Safety Concerns Posed by the Situation

Finally, it is undisputed that the roadside stop occurred "immediately next to active lanes of travel, with vehicles traveling at 55 miles per hour or greater on an unlit state highway." Filing 67 at 4 (¶15); Filing 76 at 5 (¶15). Both parties recognize in their respective briefs that the immediate proximity to the highway presented a safety concern. *See* Filing 67 at 22 (Defendants contending that Storrs "posed an additional threat to safety, as Sergeant Maas and [Smith] were directly next to an active lane of traffic on an unlit state highway); Filing 76 at 29 (Smith attempting to ground her excessive force claim against Sergeant Maas on the basis that he "grabb[ed] [her] and pull[ed] her toward oncoming traffic").

Given Plaintiffs' repeated refusals to comply with Defendants' verbal directions, Smith's physical resistance, and the fact that all of this was occurring next to an unlit and active highway, Defendants were entitled to constrain Plaintiffs "with handcuffs in order to control the scene and protect their safety." *Sanford*, 813 F.3d at 713. Plaintiffs previously displayed a repeated

43

unwillingness to comply with law enforcement demands; the imposition of such restraints under these circumstances furthered legitimate purposes by helping to control the scene and protecting the safety of all individuals—not just Defendants. *Pollreis*, 9 F.4th at 745. Therefore, in the absence of an "arrest," Plaintiffs' unlawful arrest claims necessarily fail and summary judgment in Defendants' favor is warranted.

>         d.   Even if Plaintiffs' detention became a *de facto* arrest, such an
>              arrest was supported by at least arguable probable cause.

Defendants alternatively argue that even if an arrest occurred, "Plaintiffs obstructed the Papillion Officers' investigation." Filing 67 at 17. Under Nebraska law,

> A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders . . . the enforcement of the penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority . . . .

Neb. Rev. Stat. § 28-906(1).

Beginning with Smith, the Eighth Circuit recently considered an analogous situation involving the application Neb. Rev. Stat. § 28-906 and concluded that law enforcement officers "had probable cause to arrest [the plaintiff] for obstruction of a police officer." *Awnings v. Fullerton*, 912 F.3d 1089, 1099 (8th Cir. 2019). There, law enforcement told the plaintiff that he needed to move while they dealt with his companion. *Id.* at 1100. When the plaintiff refused, an officer grabbed the plaintiff's arm and started to "yank it." *Id.* at 1099. The plaintiff then "recoiled and tried to get his arm loose." *Id.* The Eighth Circuit determined that the plaintiff's conduct amounted to "obstruction of a peace officer" under Neb. Rev. Stat. § 28-906; therefore, the officer had probable cause to arrest him for obstruction. *Id.* at 1099-1100.

44

Smith's conduct is identical in all relevant respects. "By grabbing [Smith's] arm, [Sergeant Maas] attempted to effectuate physical control over [Smith]. [Smith] resisted by pulling away." *Awnings*, 912 F.3d at 1100. Because the Eighth Circuit concluded that the exact same conduct amounted to "obstruction of a peace officer" under Neb. Rev. Stat. § 28-906 in *Awnings*, the Court concludes that Smith's actions violated the same. Therefore, "the officers had probable cause to arrest [her] for obstruction of a peace officer." *Awnings*, 912 F.3d at 1099. At a minimum, Defendants are entitled to qualified immunity because they at least had "arguable probable cause" to arrest her for such a violation. *Borgman*, 646 F.3d at 523.

It does not matter that Smith was never cited for obstructing a peace officer. "Even if an officer invokes the wrong offense at the time of an arrest, probable cause for the arrest still exists so long as the facts known to the officer would provide probable cause to arrest for the violation of some other law." *United States v. Demilia*, 771 F.3d 1051, 1054 (8th Cir. 2014) (citing *Devenpeck v. Alford*, 543 U.S. 146, 152-56 (2004). In *Devenpeck*, the Supreme "Court held that an officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *Demilia*, 771 F.3d at 1054 (quoting *Devenpeck*, 543 U.S. at 153). "In other words, an 'arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.'" *Id.* All that matters is whether Defendants were aware of facts giving rise to probable cause (or arguable probable cause) for obstructing a peace officer. The video evidence shows that they were in possession of such facts supporting probable cause to arrest Smith for obstructing a peace officer. Her unlawful arrest claim is without merit and summary judgment is appropriate. *See McCabe v. Parker*, 608 F.3d 1068, 1075 (8th Cir. 2010) (noting that the lack of probable cause is a necessary element for a Fourth Amendment claim arising out of an arrest).

As for Storrs, the Court likewise determines that Defendants had at least arguable probable cause to arrest him for obstructing a peace officer under Neb. Rev. Stat. § 28-906(1). "[E]vidence showing that a defendant resisted handcuffing and struggled with an arresting officer will sustain a conviction under this statute." *Sledge v. Clarke*, No. 4:09CV3090, 2010 WL 323917, at *10 (D. Neb. Jan. 19, 2010) (citing *State v. Campbell*, 620 N.W.2d 750, 757 (Neb. 2001; *State v. Lynch*, 394 N.W.2d 651, 661 (Neb. 1986)). Storrs argues that "at a minimum" he was *de facto* arrested once Defendants "exercised excessive force against" him. Filing 76 at 27. Accepting this premise for the limited purpose of responding to it, Storrs was not tased or otherwise touched by any Defendant until after he had already resisted handcuffing. When Storrs exited the vehicle, Officer Malone directed him to put his hands behind his back. Filing 70-2, Exhibit B at 02:58. Storrs did not comply. Filing 70-2, Exhibit B at 02:59. Later, when Officer Malone told Storrs to "turn around" Storrs again refused to comply. Filing 70-2, Exhibit B at 03:05. Before that Storrs repeatedly refused to turn off his vehicle despite Officer Malone's direction to do so. *See* Filing 70-2, Exhibit B at 00:18–00:30; 01:45–01:58.

Even if the Court were to accept that Storrs was arrested the moment Defendants first used force against him, by that point they had arguable probable cause to believe that he had obstructed peace officers in the course of their official duties. *Borgman*, 646 F.3d at 523. Based on the facts that would have been known to Defendants at the time they first exerted force against Storrs, it was objectively reasonable to conclude that they had probable cause to arrest him for obstructing a peace officer. *Copeland*, 613 F.3d at 880. Therefore, Defendants are entitled to qualified immunity on this basis and Storrs's unlawful arrest claim fails. *Borgman*, 646 F.3d at 522-23. The Court grants Defendants' Motion for Summary Judgment in their favor on Count II of Plaintiffs' Second Amended Complaint.

46

### 3. *Count III - The Excessive Force Claims*

In the third count of their Second Amended Complaint, Plaintiffs allege that Officer Rozeboom and Sergeant Maas violated their Fourth and Fourteenth Amendment rights by using excessive force against them during the incident in several different ways.[9] Unlike each of the other counts in their operative Complaint, Plaintiffs only name Officer Rozeboom and Sergeant Maas in this count. *See* Filing 17 at 9. They do not allege an excessive force claim against Officer Malone. Filing 17 at 9.

#### a. The Parties' Arguments

It is first important to address the excessive force claims that are not before the Court. In the pertinent portion of their brief discussing their excessive force claims, Plaintiffs only cite the following alleged acts: (1) Storrs was tased in the genitals, (2) Storrs was pinned to the ground, and (3) Smith was grabbed and pulled toward oncoming traffic. *See* Filing 76 at 22–25. Despite what they allege in their operative Complaint, Plaintiffs' brief in opposition to summary judgment does not argue that Defendants exercised excessive force by "donning military style gear and brandishing an AR-15," or by failing to warn Storrs before tasing him. In fact, Plaintiffs now concede that Defendants did not carry or brandish an AR-15 assault rifle that night. Filing 67 at 11 (¶69); Filing 76 at 11 (¶69). Therefore, Plaintiffs have waived their "military gear/AR-15" and

---

[9] Specifically, they claim:

> 56. By donning military-style gear and brandishing an AR-15, by tasing Storrs with no warning, multiple officers pinning him on the ground and threatening him with another tasing, by tackling Smith to the ground, by pinning Smith down with his knees on Smith's neck and Smith's waist, and by stepping on Smith's back with his boot as he handcuffed her, Rozeboom, and Maas used excessive force against Smith.

> 57. By lunging toward Smith, who was filming with both hands on her phone, Maas used excessive force against Smith.

Filing 17 at 9 (¶¶ 56-57).

"failure to warn" claims of excessive force that they pleaded in their Second Amended Complaint. *Paskert*, 950 F.3d at 540. Defendants are entitled to summary judgment on these discrete claims.

Smith's claim in her brief that she was subject to excessive force when Sergeant Maas grabbed her and pulled her toward oncoming traffic suffers from an inverse problem. She argues this in her brief, but she never pleaded it in her operative Complaint, despite amending that Complaint twice already. Instead, Smith's operative Complaint limits this excessive force claim against Sergeant Maas to the following: "By lunging toward Smith, who was filming with both hands on her phone, Maas used excessive force against Smith." Filing 17 at 9 (¶57). Despite what she argues now, her Complaint says nothing about Sergeant Maas "grabbing [her] and pulling her toward oncoming traffic." Filing 76 at 23. She cannot "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. Fed. Transit Admin*, 358 F.3d 1050, 1057 (8th Cir. 2004). Therefore, to the extent Smith contends she was subject to excessive force because she was grabbed and pulled toward traffic, this new allegation is not before the Court.

Most notably, Smith does not make any argument in her brief that either Officer Rozeboom or Sergeant Maas exercised excessive force upon Smith by tackling her, pinning her to the ground, placing their knees on her neck, or stepping on her back while handcuffing her. To be sure, Plaintiff pleaded this in her operative Complaint. Filing 17 at 9 (¶56). The problem for her is that the video footage plainly shows that Officer Malone was the one who did these things, not Officer Rozeboom or Sergeant Maas. *See* Filing 77-3 at 05:45–05:50. Because Plaintiffs decided to limit this count of their Complaint specifically to Officer Rozeboom and Sergeant Maas, there is no excessive force claim against Officer Malone for this Court to analyze in the first place. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff

48

must plead that each Government official-defendant, through the official's own individual actions, has violated the constitution"). Smith also has not pleaded or argued that Officer Rozeboom or Sergeant Maas failed to intervene to stop Officer Malone. *See Anderson v. Driskill*, 550 F. Supp. 3d 596, 621 (E.D. Ark. 2021) (observing that the Eighth Circuit recognizes "an officer can be liable for failing to intervene to stop another officer from using excessive force" but that such a claim is "distinct from an excessive force claim, meaning that [it] must be pleaded in a plaintiff's complaint"), *appeal dismissed*, No. 21-2923, 2021 WL 7160572 (8th Cir. Oct. 18, 2021). For these reasons, Officer Rozeboom and Sergeant Maas are entitled to summary judgment on Smith's claims that she was tackled to the ground, pinned down by the placement of knees on her neck and waist, and had her back stepped on while being handcuffed.

As for the claims that remain, Defendants argue they are entitled to qualified immunity and that the force they used was objectively reasonable. The Court will address the parties' specific arguments on these individualized allegations during the course of its analysis below.

> b. Applicable Standards

"The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). "The test for establishing a constitutional violation under the Fourth Amendment's right to be free from excessive force is 'whether the amount of force used was objectively reasonable under the particular circumstances.'" *Montoya v. City of Flandreau*, 669 F.3d 867, 870–71 (8th Cir. 2012) (quoting *Brown*, 574 at 496). A court "rel[ies] on the perspective of a reasonable officer present at the scene rather than the $^{20}/_{20}$ vision of hindsight" in applying this test. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017) (internal quotation marks omitted). "The dispositive question" in terms of qualified

49

immunity "is whether the violative conduct is clearly established." *Kelsay v. Ernst* 933 F.3d 975, 979 (2019) (quoting *Mullenix*, 577 U.S. at 12) (internal quotation marks omitted). As the Supreme Court has explained, specificity is especially important in excessive force cases given that it is sometimes difficult for an officer to determine how this legal doctrine will apply to the factual situation at hand. *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curium).

For example, in an en banc decision in *Kelsay*, the Eighth Circuit overturned the district court's denial of summary judgment on an excessive force claim. 933 F.3d at 977. In concluding that the defendant was entitled to qualified immunity, the Eighth Circuit noted that "[a] plaintiff must identify either controlling authority or a robust consensus of cases of persuasive authority that place[s] the statutory or constitutional question beyond debate at the time of the alleged violation." *Id.* at 979 (internal quotation marks omitted). The district court in *Kelsay* initially denied qualified immunity to the defendant, reasoning "that where a nonviolent misdemeanant poses no threat to officers and is not actively resisting arrest or attempting to flee, an officer may not employ force just because the suspect is interfering with police or behaving disrespectfully." *Id.* at 980. The Eighth Circuit majority disagreed on appeal, however. *Id.* It concluded that "[n]one of the decisions cited by the district court or [the plaintiff] involved a suspect who ignored an officer's command and walked away, so they could not clearly establish the unreasonableness of using force under the particular circumstances here." *Id.* Putting it another way, "[n]one of [the plaintiff's] authorities 'squarely govern[ed] the specific facts at issue.'" *Id.* (quoting *Kisela*, 138 S. Ct. at 1153).

"A different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." *Cnty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1544 (2017). As the Supreme Court has also put it, "[O]nce a use of force is deemed reasonable . . . it

50

may not be found unreasonable by reference to some separate constitutional violation." *Id.* at 1547 n* (emphasis in original). *Id.* at 1547. The objective reasonableness analysis in an excessive force claim "must be conducted separately for each . . . seizure that is alleged to be unconstitutional." *Mendez*, 137 S. Ct. at 1547; *see also Blazek v. City of Iowa City*, 761 F.3d 920, 923 (8th Cir. 2014) (bifurcating consideration of "two discrete uses of force by the officers"); *Rudley v. Little Rock Police Dep't*, 935 F.3d 651, 653 (8th Cir. 2019) (separately considering each of the three distinct tasings that occurred in determining whether qualified immunity applied).

c.   The Remaining Claim of Excessive Force brought by Smith

As already discussed above, most actions that Smith claims to constitute excessive force cannot survive Defendants' Motion for Summary Judgment because those acts were not committed by either Officer Rozeboom or Sergeant Maas. Her only remaining excessive force claim is that "[b]y lunging toward Smith, who was filming with both her hands, [Sergeant] Maas used excessive force against Smith." Filing 17 at 9 (¶57). Even if Smith had properly argued this claim in her brief, it would still fail on the merits.

The video footage in this case precludes a reasonable juror from finding that Officer Rozeboom was involved in this claim. Thus, Officer Rozeboom is necessarily entitled to summary judgment. *See Ashcroft* 556 U.S. at 676. As to Sergeant Maas, Smith falls woefully short of meeting her burden to establish that it would have been sufficiently clear that "lunging toward her" under the circumstances violated the Fourth Amendment. *See Morgan*, 920 F.3d at 524 (noting it is the plaintiff's "burden to establish that the law is clearly established"). Smith's brief does not point to any authority indicating that the "particularized" facts of the case posed a clear violation of the Fourth Amendment. *See White*, 137 S. Ct. at 522. Nor does she cite any existing precedent that would "have placed the . . . constitutional question beyond debate." *Morgan*, 920 F.3d at 524

(internal quotation marks omitted). Therefore, even if one were to somehow find that Sergeant Maas exercised excessive force simply by "lunging toward" Smith under these circumstances, he would still be entitled to qualified immunity under the second prong of the test for qualified immunity. *Kelsay*, 933 F.3d at 979. The Court grants summary judgment in Sergeant Maas's favor on this specific allegation.

### d.   Storrs's Claim of Excessive Force

Storrs alleges that he was subject to excessive force because he was (1) tased, and (2) subsequently pinned to the ground. Filing 17 at 9 (¶56); Filing 76 at 23. Storrs alleged in his Complaint that "[t]he taser darts struck [him] in the torso, arm, and in the genitals." Filing 17 at 6 (¶34). In his brief opposing summary judgment, Storrs argues that the fact he was tased in the genitals is pertinent because tasing someone in the genitals "amounts to 'deadly force' under [the Papillion Police Department's] own policy." Filing 76 at 25. If Officer Rozeboom did use "deadly force" by tasing Storrs in the genitals, then "[e]xisting case law would have made it sufficiently clear to a reasonable officer that a suspect cannot be apprehended by use of deadly force unless that individual poses a threat of serious physical harm." *Nance*, 586 F.3d at 611. Consistent with the Supreme Court's direction in *Mendez*, 137 S. Ct. at 1547, the Court will individually addresses these two claims.

### i.   Storrs's Claim of Excessive Force for Being Tased

The Court concludes that Defendants are entitled to qualified immunity on Storrs's excessive force claim for being tased. As an initial matter, there is no evidence showing that anyone other than Officer Rozeboom deployed a taser on December 26, 2019, and neither Plaintiffs nor Defendants suggest otherwise in their briefs. Upon the foregoing, the Court grants summary judgment in Sergeant Maas's favor on this specific claim because there is no genuine issue of

material fact that Officer Rozeboom was the sole individual to deploy a taser. Plaintiffs have not identified any involvement of Sergeant Maas in the tasing. *See Ashcroft*, 556 U.S. at 676.

Turning to the merits of Storrs's claim against the remaining Defendant, the Court concludes that Officer Rozeboom is entitled to qualified immunity because Storrs has failed to show that the "violative nature of [the] *particular* conduct" he complains of was "clearly established" at the time. *Kelsay*, 933 F.3d at 979 (emphasis in original) (explaining the second prong of the qualified immunity analysis). Storrs fails to meet his burden under this prong because he does not point to any case that "squarely governs the facts at issue." *Id.* at 980. Nor does he cite "a robust consensus of cases of persuasive authority that place[s] the . . . constitutional question beyond debate at the time of the alleged violation. *Id*. at 979 (internal quotation marks omitted). Indeed, the portion of Storrs's brief that addresses his excessive force claim only cites three cases. *See* Filing 76 at 22 (citing *Montoya v. City of Flandreau*, 669 F.3d 867, 871 (8th Cir. 2012); Filing 76 at 23 (citing *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013); Filing 76 at 24 (citing *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983). Far from squarely governing the particular facts at issue in this case, not one of these three cases involves any discussion of "tasing" as constituting excessive force.

Given the absence of any controlling precedent or even persuasive authority in his favor, the Court concludes that Storrs has failed to meet his burden and Officer Rozeboom is entitled to qualified immunity. Although Storrs did not cite any cases involving the use of a taser in the portion of his brief addressing excessive force, cases involving the use of tasers support this conclusion because Storrs repeatedly refused to comply with law enforcement directives while standing next to an inherently dangerous roadside. *Contra Brown*, 574 F.3d at 499 (concluding that "the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a

nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator"); *Shekelton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012) (finding defendant was not entitled to qualified immunity where he tased "an unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him").

In contrast to *Brown* and *Shekelton*, the Eighth Circuit has concluded that qualified immunity was proper where the officers on "the scene reasonably could have interpreted [the plaintiff's] behavior of continuing to lay on his hands and refusing to comply with instructions as resistance and reasonably responded . . . regardless of whether [the plaintiff] actually intended to resist." *Ehlers*, 846 F.3d at 1011. Similarly, in *Rudley*, the Eighth Circuit considered another claim of excessive force involving use of a taser and determined that the defendants were entitled to qualified immunity. 935 F.3d at 652. In reaching this conclusion, the court noted that this case was distinguishable from *Shekelton*, 677 F.3d at 361, because the situation in *Rudley* involved "aggressive behavior and a 'chaotic and combative' scene[.]" *Rudley*, 935 F.3d at 654. The *Rudley* court reasoned that the situation was more like that presented in *Kelsay*, where "the scene was a tumultuous one involving seemingly aggressive and noncompliant behavior, circumstances which we have previously held rendered officers' uses of tasers reasonable." *Id.* The court expressly distinguished the conduct at issue from the conduct in *Shekelton*, where plaintiff "did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him." *Rudley*, 935 F.3d at 651 (quoting *Shekelton*, 677 F.3d at 366). It then further distinguished the plaintiff's case from "the seat-belt-restrained passenger cowering in her automobile" who brought suit in *Brown*. *Rudley*, 935 F.3d at 651 (citing *Brown*, 574 F.3d at 499).

54

The Eighth Circuit has further admonished that "[w]e must allow for the fact police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Cook v. City of Bella Villa*, 582 F.3d 840, 851 (8th Cir. 2009) (internal quotations omitted). The situation here fits that bill. Storrs was innocent of the shoplifting offense, but he repeatedly refused to comply with a number of different directions, exhibited what could reasonably be perceived to be aggressive body language, vehemently argued with the officers when he was told that he was being detained, and he did all of this during a nighttime roadside stop "immediately next to active lanes of travel, with vehicles traveling at 55 miles per hour or greater on an unlit state highway." Filing 67 at 4 (¶15); Filing 76 at 5 (¶15).

In this sense, this case is more like *Rudley* than *Shekleton* or *Brown*. Like the officer in *Rudley*, "a reasonable officer in [Officer Rozeboom's] position could have believed that it was important to control the situation and to prevent a confrontation . . . that could escalate" especially once Storrs reached toward Smith as she actively tried to pull away from Sergeant Maas's grip. *See Rudley*, 935 F.3d at 654. The Court is not aware of any controlling case or a conglomeration of persuasive authority clearly establishing that an officer used excessive force by tasing an individual in the midst of an increasingly chaotic situation along an unlit highway after an argumentative suspect who had repeatedly refused to comply with law enforcement demands made a sudden move in the direction of a fellow officer while all parties were standing in close proximity to active lanes of traffic. Even if such a use of force was excessive, qualified immunity would still be appropriate given the lack of evidence suggesting that Officer Rozeboom's decision to deploy his taser was made as the result of plain incompetence or a knowing violation of the law. *See Ashcroft*, 563 U.S. at 743.

55

To the contrary, when Plaintiffs submitted their brief in opposition to summary judgment, they included a four-page excerpt from Officer Rozeboom's deposition testimony as evidentiary support. *See* Filing 77-5. In this excerpt from his deposition, Officer Rozeboom stated that at the time he deployed his taser he perceived Storrs to be lunging toward Sergeant Maas. Filing 77-5, Exhibit D at 32-33. Officer Rozeboom later acknowledged that as it turned out Storrs was reaching out to grab for Smith. Even so, he said that he initially "didn't know what [Storrs] was grabbing for . . . ." Filing 77-5, Exhibit D at 33. Officer Rozeboom further stated at his deposition that his "interpretation at the time" was that Storrs was going to assault Sergeant Maas. Filing 77-5, Exhibit D at 32. Even when viewing this evidence in the light most favorable to Storrs (which, again, Plaintiffs submitted for consideration), Officer Rozeboom's deposition testimony only reinforces the Court's conclusion that qualified immunity is appropriate here.

This evidence may support Plaintiff's theory that Officer Rozeboom was mistaken, but qualified immunity shields government officials from reasonable mistakes. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'"). At best, Storrs has produced evidence showing Officer Rozeboom was mistaken. What this evidence does not do is show a knowing violation of clearly established law. The ultimate issue "in discerning whether [an officer's] actions [meet] the Fourth Amendment's standard of reasonableness . . . is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Sanford*, 813 F.3d at 713 (alterations in original). The very evidence Plaintiff has asked this Court to consider undermines any contention that Officer Rozeboom tased Storrs for a reason other than concern for a fellow officer's safety. Put differently, Plaintiffs have not offered evidence demonstrating a genuine issue of material fact; they have

56

offered evidence which establishes the lack of a factual dispute. *See* Filing 67 at 22 (Defendants arguing that "Officer Rozeboom reasonably believed that Mr. Storrs was going to engage in a physical struggle with Sergeant Maas, who had just grabbed hold of Ms. Smith").

Furthermore, the parties' dispute about whether Storrs was tased in the genitals does not alter the Court's conclusion. Storrs's reliance on the Papillion Police Department's Use of Force Policy is misplaced insofar as he contends tasing a person in the genitals constitutes "deadly force." By its own terms, the Papillion Police Department Use of Force Policy only deems the tasing of the groin to constitute "deadly force" when an officer "intentionally" targets an individual's groin. *See* Filing 81 at 14. Plaintiffs recognize this fact, because they alleged that "[p]ursuant to the Papillion Police Department (PPD) policy, intentionally tasing someone in the genitals is deadly force." Filing 76 at 15 (¶26). Plaintiffs did not allege in their operative Complaint that Officer Rozeboom intentionally targeted Storrs' groin. *See* Filing 17 at 6 (¶¶33-34, 55-59). Nor did they claim that Officer Rozeboom did so in their brief opposing summary judgment. *See* Filing 76 at 1, 9 (¶47), 15 (¶26), 23, 25. While Storrs has repeatedly insisted that he was struck in the genitals, at no point does he claim—much less point to any evidence to support—that Officer Rozeboom did so intentionally. In fact, Storrs admits that the "[t]he taser darts struck [him] in the torso, arm, and in the genitals," Filing 17 at 6 (¶34), and the Papillion Use of Force Policy expressly states that "[t]asers are most effective and least dangerous when targeted at large muscle groups, such as the back glutes, legs, arms, and abs." Filing 81 at 14.

57

Officer Rozeboom also discussed this matter in his deposition when questioned by Plaintiffs' counsel. *See generally* Filing 82-1 at 114 (49:1–53:15).[10] Officer Rozeboom stated that the "preferred targeting zone" for a taser would be "the back of a subject and splitting the beltline." Filing 82-1 at 114 (52:20-22). He further stated that "if you watch my [body camera footage], you can see that I'm trying to position myself so that I can deploy the taser to Mr. Storrs' back, but he's interacting with Sergeant Mass, there is a vehicle there, and he's turning." Filing 82-1 at 114 (53:2–6). Officer Rozeboom said that because Storrs was facing him, he "then transition[ed] to more splitting the beltline, so lower to mid stomach and like upper thigh muscle would be the preferred targeting zone." Filing 82-1 at 114 (53:7-11). According to Officer Rozeboom, "if you split the beltline, you can get two different muscle groups that will lock a subject up, and we can take him into custody relatively quickly." Filing 82-1 at 114 (53:11-15).

Even if adherence to the Papillion Police Department Use of Force Policy was theoretically dispositive in resolving whether a constitutional violation occurred or whether qualified immunity is warranted, there simply is no evidence from which a reasonable juror could conclude that Officer Rozeboom "intentionally" targeted Storrs's groin when he deployed his taser. As such, Plaintiffs have failed to show an issue of fact that is sufficient to "affect the outcome of the suit" and "to persuade a reasonable jury to return a verdict for" them. *Erickson v. Nationstar Mortg.*, LLC, 31

---

[10] This portion of Officer Rozeboom's deposition was offered by Defendants along with their reply brief. *See generally* Filing 81, Filing 82. Plaintiffs did not file any objection to this Court's consideration of such evidentiary material. NECivR 7.1(c)(1) permits a party to "file a reply brief and index of evidence within 7 days after the opposing party files and serves the opposing brief." However, "a reply brief may not raise new grounds for relief or present matters that do not relate to the opposing party's response." NECivR 7.1(c)(2). Here, after Plaintiff filed an excerpt from Officer Rozeboom's deposition along with their opposition brief (Filing 77-5), Defendants submitted the entirety of Officer Rozeboom's deposition. Filing 82 at 99–132. Under these circumstances, and particularly given the lack of an objection from Plaintiffs, the Court concludes that Defendants were permitted to submit the complete deposition of Officer Rozeboom along with their reply brief in accordance with NECivR 7.1(c)(1)-(2). The above-cited portion of Officer Rozeboom's deposition "relate[s] to [Plaintiffs'] response." NECivR 7.1(c)(2). Specifically, it pertains to Plaintiff's contention that Officer Rozeboom used "deadly force" by tasing Storrs in the genitals.

F.4th 1044, 1047–48 (8th Cir. 2022). Officer Rozeboom is likewise entitled to qualified immunity under the second prong of the test because Storrs has not identified "controlling authority or a robust consensus of cases of persuasive authority placing the constitutional question beyond debate." *Rudley*, 935 F.3d at 653 (internal quotation marks omitted). Accordingly, the Court grants summary judgment in his favor on this claim.

### ii. Storrs's Claim of Excessive Force for Being Pinned to the Ground

Storrs's final claim of excessive force encompasses both Officer Rozeboom and Sergeant Maas. Storrs claims that these Defendants exerted excessive force against him by pinning him to the ground. *See* Filing 17 at 9 (¶56); Filing 76 at 23. Here again, it is important to stress that "[a] different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." *Mendez*, 137 S. Ct. at 1544. The objective reasonableness analysis in an excessive force claim "must be conducted separately for each . . . seizure that is alleged to be unconstitutional." *Id.* at 1547. It does not matter whether the initial tasing of Storrs was objectively reasonable or not; the Court assesses this discrete use of force involving pinning Storrs to the ground on its own terms. So even if one were to assume *arguendo* that Storrs should never have been tased in the first place, the Court must analyze this claim of excessive force independently. Therefore, the operative question is whether "the law was sufficiently clear that every reasonable official would understand that what [they] were doing [was] unlawful" at the time Defendants pinned Storrs down while they attempted to handcuff him. *Pollreis*, 9 F.4th at 743.

Storrs does not point to any authority suggesting that he had a clearly established right not to be pinned down to the ground while two officers attempted to handcuff him. All Storrs says in his brief is that when viewed in the light most favorable to him, "the Officers' use of force in tasing

[Storrs] and pinning him to the ground . . . was a violation of [his] Fourth Amendment rights." Filing 76 at 23. The Court does not find that this perfunctory statement without any accompanying citation is enough for a plaintiff to meet his burden to show that he suffered a violation of clearly established law. *See Morgan*, 920 F.3d at 524 (noting it is the plaintiff's "burden to demonstrate that the law is clearly established"). Upon its own review of the case law, the Court is not aware of any authority that "squarely governs the specific facts at issue" in Storrs's favor. *Kelsay*, 933 F.3d at 980. Officer Rozeboom and Sergeant Maas are, thus, entitled to qualified immunity under the second prong of the test. *Kelsay*, 933 F.3d at 979 For all of the reasons addressed above, the Court grants summary judgment in Defendants' favor as to Count III of Plaintiffs' Second Amended Complaint.

### 4. Count IV - The First and Fourteenth Amendment Retaliation Claims

In the Fourth Count of their Second Amended Complaint, Plaintiffs raise claims under the First and Fourteenth Amendments. Specifically, they claim that their "protected speech was a substantial motivating factor in Defendants' conduct including the unlawful detention, unlawful arrest, and excessive force against [Plaintiffs] and officers lacked probable cause to arrest [Plaintiffs] . . . ." Filing 17 at 10 (¶63). Their complaint identifies two distinct kinds of conduct they claim was protected: (1) Storrs's and Smith's criticism of the police officers when they were initially pulled over, and (2) Smith's attempt to film officers while outside the vehicle. Filing 17 at 10 (¶61).

#### a. The Parties' Arguments

Defendants concede "that the *ordinary* practice of filming police officers or criticizing the actions of police officers are protected activities[.]" Filing 67 at 25 (emphasis in original). Nevertheless, they contend that Plaintiffs' "conduct during the [i]ncident far exceeded any activity

60

warranting protection under the First Amendment." Filing 67 at 25. If Plaintiffs were somehow engaged in protected conduct, Defendants posit that their own "actions were not taken in response to any constitutionally protected actions, nor motivated in any way by any constitutionally protected actions." Filing 67 at 25. They instead insist that the actions they took that night were "directly supported by the circumstances justifying the stop and detention of Plaintiffs . . . . ." Filing 67 at 25.

For their part, Plaintiffs emphasize that the causal-connection prong in a First Amendment retaliation claim generally presents a jury question. Filing 76 at 29. Plaintiffs then argue that they "have put forward affirmative evidence that [Defendants] arrested, detained, and used excessive force on them for exercising their First Amendment rights." Filing 76 at 29. They cite what they describe as Officer Malone's "aggressive" tackling of Smith and Sergeant Maas's pulling of Smith "in the direction of oncoming traffic as she filmed the encounter." Filing 76 at 29. They also cite Officer Rozeboom's tasing of Storrs. Filing 76 at 28–29. Plaintiffs submit that "a jury could easily conclude that [Defendants'] treatment of [Plaintiffs]—particularly with the tasing and tackling— was motivated 'at least in part' by the exercise of their First Amendment rights to question and film the Officers' actions." Filing 76 at 29.

       b.  Applicable Standards

"The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019). "[C]riticism of public officials lies at the very core of speech protected by the First Amendment." *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014) (noting "[t]he defendants do not deny that criticizing a police officer and asking for his badge number is protected speech under the First Amendment. Nor could they."). "The freedom of individuals verbally to oppose or

61

challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987). Thus, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out[.]" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal citation and quotation marks omitted) (alteration in original). At the same time, it is insufficient for a plaintiff merely to "show that the defendant arrested or used force against the plaintiff in response to conduct that in fact was protected. If the response was driven not by 'animus' but by the defendant's understanding— however mistaken—of his official duties, then it was not 'retaliatory.'" *Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th Cir. 2022) (internal citation omitted).

To make out a First Amendment retaliation claim, Plaintiffs must establish three elements: (1) that they engaged in a protected activity, (2) that a government official took adverse action against them that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity. *Hoyland v. McMenomy*, 869 F.3d 644, 655 (8th Cir. 2017). However, where a plaintiff makes out a retaliatory arrest claim, he must also meet a fourth prong: the "lack of probable cause or arguable probable cause." *Id.*[11] The Eighth Circuit has instructed that the causal connection prong generally presents "a jury question unless the question is so free from doubt as to justify taking it from the jury." *Peterson*, 754 F.3d at 603 (cleaned up). In more recent years it has further clarified that "[t]o survive summary judgment, a plaintiff must show that a reasonable jury could find that a retaliatory

---

[11] In *Nieves*, the Supreme Court clarified that "probable cause should generally defeat a retaliatory arrest claim" but carved out an exception for when "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech" were not arrested. 139 S. Ct. at 1727. The present case does not implicate this exception and Plaintiffs have not argued otherwise.

motive of the government official was a 'but-for-cause' of the adverse action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) (quoting *Nieves* 139 S. Ct. at 1722), *reh'g denied* (Aug. 20, 2021). A plaintiff may prove the existence of a retaliatory motive "through 'circumstantial evidence giving rise to an inference of retaliatory intent[.]'" *Ackerman v. City of Iowa*, 19 F.4th 1045, 1059 (8th Cir. 2021).

> ### c. Plaintiffs Have Provided Sufficient Evidence That They Engaged in a Protected Activity

The Court concludes that both Plaintiffs have provided sufficient evidence showing they engaged in at least some activity that was protected by the First Amendment on the night in question. Therefore, they have satisfied the first prong of the test. *Hoyland*, 869 F.3d at 655. Both Plaintiffs verbally criticized Defendants at various points throughout the encounter. For instance, Smith called Officer Malone "a racist piece of crap," antagonistically asked how many "stripes" he had (*i.e.*, questioned his rank), and demanded to know his badge number. Storrs also directed a number of pointed comments at Defendants. This included, *inter alia*, calling the officers racists, pieces of sh\*\*, f\*\*\*\*ing pieces of sh\*\*, racist pieces of sh\*\*, and accusing the officers of profiling him. *See* Filing 70-2, Exhibit B at 01:09, 01:19, 01:50. 03:05, 03:15. The First Amendment protected their right to say all of this. Indeed, "[t]he First Amendment 'protects a significant amount of verbal criticism and challenge directed at police officers." *Hoyland*, 869 F.3d at 655 (internal quotation marks omitted); *see also Hill*, 482 U.S. at 462-63. After being pulled over in furtherance of an investigation into a crime they had nothing to do with, Plaintiffs' colorful, even profane, criticisms of law enforcement were just that—criticisms. It is settled law that law enforcement may not retaliate against individuals for speaking out. *Hartman*, 547 U.S. at 256.

Therefore, Plaintiffs have provided sufficient evidence on the first prong of each of their specific retaliation claims. The Court now turns to the remainder of the test.

> d. The First Amendment Claims that Apply to Both Storrs and Smith

The Court begins with the First Amendment claims that apply to both Storrs and Smith. In their operative Complaint, both Plaintiffs allege that their protected speech "was a substantial motivating factor in Defendants' conduct including" their "unlawful detention" and "unlawful arrest[.]" Filing 17 at 10 (¶63). However, the Court previously concluded that neither Plaintiff was "arrested." Therefore, they cannot prove they were "arrested" in retaliation for anything. This is a fundamental and fatal flaw in their retaliatory arrest claim. The Court alternatively concluded that even if Plaintiffs were arrested, there was probable cause or at least arguable probable cause to arrest them for obstructing peace officers in violation of Neb. Rev. Stat. § 28-906(1). This alternative basis also precludes their retaliatory arrest claim from going forward because "[l]ack of probable cause is a necessary element of a First Amendment retaliatory arrest claim." *McCabe*, 608 F.3d at 1075 (internal quotation marks omitted); *see also Hoyland*, 869 F.3d at 655 (describing the fourth element of a retaliatory arrest claim as requiring the plaintiff to show a "lack of probable cause or arguable probable cause"). The Court grants summary judgment in Defendants' favor on Plaintiffs' retaliatory arrest claims.

Plaintiffs' retaliatory detention claims fail for a different reason. Plaintiffs were detained once they were pulled over. That happened well before they said anything to Defendants and before Smith began filming them. Logically then, Plaintiffs cannot show that their speech or Smith's filming was the "but-for-cause" of their detention. *Graham*, 5 F.4th at 889. Plaintiffs do not make any claim in their operative Complaint nor any argument in their brief that their detention ran afoul

of *Terry* because the stop took too long and that Defendants would not have taken so long "but for" Plaintiffs' protected exercises. Again, they make clear in their brief that the unlawful detention they complained of in Count I of their operative Complaint "is premised on the Defendant Officers' initial stop of Plaintiffs' vehicle." Filing 76 at 18 (citing their own Second Amended Complaint, Filing 17 at 7-8). Plaintiffs did not criticize or film Defendants until they had already been detained. The Court previously determined that Defendants' stop of the vehicle was supported by reasonable suspicion or at least arguably supported by reasonable suspicion. Even if this were not the case, Plaintiffs cannot go forward on this claim given the timing of events. For the foregoing reasons, the Court grants summary judgment in Defendants' favor on Plaintiffs' retaliatory detention claims.

    e.  Smith's First Amendment Claims

The Court turns next to Smith's specific claims. As pleaded in her operative Complaint, Smith alleges that she suffered the following as a consequence of exercising her First Amendment rights: (1) she was lunged at in order to stop her from filming the encounter, and (2) she was tackled, pinned to the ground, and stepped on. Filing 17 at 10 (¶62). She elaborates in her brief that "Officer Malone aggressively tackled [her] immediately after she pulled out her phone to capture" Storrs being tased. Filing 76 at 29. Though Smith also claims in her brief that Sergeant Maas "pulled [her] in the direction of oncoming traffic as she filmed the encounter," Filing 76 at 29, she never pleaded this in her operative Complaint. Her Complaint limited the alleged adverse action to being "lung[ed] toward to prevent her from filming." Filing 17 at 10 (¶62). None of these claims relate to actions taken by Officer Rozeboom. Therefore, Officer Rozeboom is entitled to summary judgment in his favor on Smith's claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government official-defendant, through the official's own individual actions, has violated the constitution"). The Court now separately assesses Smith's claims against Sergeant Maas and Officer Malone.

> i. Smith's Retaliatory Use of Force Claim Against Sergeant Maas Cannot Go Forward

Smith's First Amendment retaliation claim against Sergeant Maas for "lunging toward" her does not survive Defendants' motion for summary judgment. Even accepting that some of what Smith said and did was protected under the First Amendment, Sergeant Maas did not "lung[e] toward" Smith until after she refused to comply with his direction to "come this way." Filing 70-3, Exhibit B at 0:30. Smith had been criticizing the officers and filming them well before that, but Sergeant Maas only moved toward Smith and grabbed her arm after she placed herself in front of Sergeant Maas and continued to approach him while Sergeant Maas was still attending to Storrs. The Eighth Circuit has recognized the clearly established nature of the "right to watch police-citizen interactions at a distance and without interfering." *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (emphasis added). In this case, however, when viewing the evidence in the light depicted by the video, *Scott*, 550 U.S. at 381, Smith was not watching "at a distance . . . without interfering." *Chestnut*, 947 F.3d at 1090. She was standing in the way of Sergeant Maas and a different suspect next to a dark highway.

Smith has not pointed to any case that clearly establishes a right to film or criticize police officers on a roadway while standing in front of an officer holding a taser who is trying to get a different, noncompliant suspect to cooperate. The Court is not aware of any such case either. To the contrary, the Supreme Court has said that an individual's refusal "to move after being directed to do so [by law enforcement] was not, without more, protected by the First Amendment." *Colten*

66

*v. Kentucky*, 407 U.S. 104, 109 (1972). The Supreme Court went on to explain that the individual "had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at the time." *Id.* It further noted that "[t]he State has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction." *Id.* More recently, in discussing *Colten*'s contours, the Eighth Circuit observed that "the location of the traffic stop in *Colten*—a busy highway—implicated important concerns of public safety." *Hoyland*, 869 F.3d at 656.

Even assuming *arguendo* that Sergeant Maas's use of force under these circumstances would chill a person of ordinary firmness from engaging in a protected activity, *Scheffler*, 743 F.3d at 621, there is simply no evidence to suggest that Sergeant Maas would not have exerted any force "but for" the fact that Smith was criticizing or filming the officers. *Graham*, 5 F.4th at 889. Smith was criticizing Defendants for some time before anyone ever laid hands on her. The first person to touch her was Sergeant Maas, and he did not do so until after she was on the roadside and refused to comply with his direction to "come this way." As in *Colten*, Smith had no right to engage with Sergeant Maas given that he was attending to Storrs. *Colten*, 407 U.S. at 109.

In her deposition, Smith was asked what facts she had "to support [her] allegation that Sergeant Maas was attempting to stop [her] from filming[.]" Filing 68-1 at 8. She responded, "It was the only thing I was -- I was doing, so I think by grabbing my arm he was just trying to get me to stop." Filing 68-1 at 8. Smith's statement is patently untrue, where viewing the evidence in the light depicted by the video, *Scott*, 550 U.S. at 381, she was interfering with Sergeant Maas's discussion with Storrs by placing herself in front of Storrs, and she then moved toward Sergeant Maas blocking his access to Storrs.

67

Furthermore, Smith did not point to anything else suggesting a retaliatory motive on Sergeant Maas's part. The Court recognizes that "[r]etaliatory motive may be proved through 'circumstantial evidence giving rise to an inference of retaliatory intent[.]'" *Ackerman v. City of Iowa*, 19 F.4th 1045, 1059 (8th Cir. 2021). Even so, no reasonable juror could find that the actions toward Smith taken by Sergeant Maas would not have happened "but for" her prior exercise of protected activity. After Smith disobeyed Sergeant Maas's direction to "come this way," she physically resisted his grip and fell toward Storrs. Filing 70-2, Exhibit B at 03:40. Sergeant Maas did not previously touch Smith when she was engaged in the lawful exercise of her First Amendment rights; he "lunged toward her" and grabbed her once her actions fell outside the bounds of First Amendment protection by actively interfering with a law enforcement situation along a highway—much like in *Colten*.

Although Smith claims in her brief that Sergeant Maas "pulled [her] in the direction of oncoming traffic as she filmed the encounter[,]" Filing 76 at 29, this assertion is belied by the video footage. Officer Malone's dash camera shows that Smith placed herself on the traffic-side of the white line separating the highway from the shoulder almost immediately upon exiting the car. Filing 77-3 at 05:15. The dash camera also shows that when Sergeant Maas grabbed Smith, she initially jerked her body toward the highway in the opposite direction of Sergeant Maas before then jerking toward Storrs and landing on the ground. Filing 77-3 at 05:37—05:42. Sergeant Maas maintained his hold and pulled her back toward the shoulder, which was appropriate action to protect her and himself from passing traffic. Filing 77-3 at 05:37. Here, the question of causation "is so free from doubt as to justify taking it from the jury." *Peterson*, 754 F.3d at 603. For these reasons, the Court grants summary judgment in favor of Sergeant Maas as to Smith's claims against him for retaliatory use of force.

68

> ii. Smith's Retaliatory Use of Force Claim against Officer
> Malone Cannot Go Forward

Smith's retaliatory use of force claim against Officer Malone for tackling her, pinning her to the ground, and stepping on her also fails because, again, the question of causation "is so free from doubt as to justify taking it from the jury." *Peterson*, 754 F.3d at 603.[12] It is important to stress that before Officer Malone did any of these things, Smith launched a barrage of criticisms at him and his fellow officers, yet they let her do so without incident. Smith demanded that Officer Malone provide him with her badge number. Filing 70-2, Exhibit B at 00:14. She pointed her cell phone in his direction (ostensibly recording him) seconds later. Filing 70-2, Exhibit B at 00:33. A little while after that, Smith called Officer Malone a "racist piece of crap" to his face. Filing 70-2, Exhibit B at 01:05. She then questioned his rank by asking, "how many stripes you got, Malone?" Filing 70-2, Exhibit B at 02:34. In fact, this latter remark even prompted Storrs to tell Smith, "Don't talk crap." Filing 70-2, Exhibit B at 02:40.

Officer Malone did not respond to any of this in a manner that could be described as taking an "adverse action." He largely stood there and took it. At one point, he remained silent for a period of approximately 20 seconds and allowed Plaintiffs to continue their verbal protest while they were sitting in the car. Filing 70-2, Exhibit B at 01:20–01:45. Even when Smith hopped over the center console and injected herself into Storrs's detention alongside a dark and busy highway—thereby

---

[12] The Court resolves this issue based on Smith's failure to meet the third prong of her First Amendment retaliation claim. As to whether Smith suffered an adverse action, it may well be reasonable to argue that being tackled, pinned to the ground, and stepped on would be sufficient to chill a person of ordinary firmness from continuing in protected activity. *Scheffler*, 743 F.3d at 621. At the same time, the force alleged here did not stop Smith from continuing to engage in expressive activity. While being handcuffed, Smith told Storrs, "Don't worry babe, we're going to sue them. Don't worry, they're getting sued." Filing 70-2, Exhibit B at 4:25. Later, while being placed in the back of a patrol car, Smith told Officer Malone, "You guys are going to be famous for this." Filing 70-2, Exhibit B at 06:20.

placing herself outside the protections of the First Amendment by interfering with law enforcement officers engaged in the course and scope of their duties in an inherently dangerous setting—officers still did not lay a hand on her or tell her to put the phone away. Sergeant Maas, the first officer to touch Smith, only touched her after she refused to comply with his verbal direction to move out of the way. Filing 70-2, Exhibit B at 03:38. In sum, Defendants allowed Smith to protest for some time after she began interfering with Storrs's detention outside the car—even though they did not have to by that point. The fact that Officer Malone did not take any "adverse action" up to this point undermines Smith's contention that he retaliated against her based upon her exercise of protected activity—especially given what transpired next.

Even as Smith tussled with Sergeant Maas, Officer Malone did not touch her. It was only when Smith picked herself up off the ground after Storrs was tased and began taking steps toward Sergeant Maas and Officer Rozeboom with her phone pulled out that Officer Malone took any action. Filing 77-3 at 05:40. When Smith once again injected herself in Storrs's detention by trying to reenter the melee, Officer Malone grabbed her. Filing 77-3 at 05:46. In other words, Officer Malone did not touch Smith until she made yet another attempt to engage in conduct that fell outside the bounds of First Amendment protection. *Colten*, 407 U.S. at 109.

Officer Malone began by pushing Smith against the passenger side of Storrs's vehicle. Filing 77-3 at 05:47. The video shows Smith continuing to resist, followed by Officer Malone hooking his right arm across Smith's neck and collarbone area to grab her left shoulder before throwing her face-first into the grass beside the road. Filing 77-3 at 05:45–05:52. The dash camera footage does not capture what happens next, but Officer Malone's body camera footage does. *See* Filing 70-2 at 03:45. After Smith was thrown to the ground, she began to scream that she could not breathe, and Officer Malone grabbed around the back part of her neck with his hand and yelled,

70

"Stop resisting!" Filing 70-2 at 03:58. Officer Malone continued to grasp the back of her neck for approximately 17 seconds until Smith complied. Filing 70-2 at 04:02-04:19. Officer Malone proceeded to pin Smith face-down on the ground while he checked her for weapons. *See* Filing 70-2 at 04:57–05:25.

In his written report, Officer Malone stated that before he began physically restraining Smith, he "was mindful of her previous attempt to actively resist" when she "pulled away from Sergeant Maas[.]" Filing 70-2 at 4. His report went on to state:

> I initially gained control of Smith by pushing her to the vehicle and wrapping my arms around her shoulders. I knew that handcuffing Smith while standing would not be feasible and needed to take Smith to the ground. I was cognizant that the side of the highway was dirt and grass and would provide a softer landing area. I utilized a leverage takedown and brought Smith to the ground. I placed my shin on her back to gain control of Smith, but was not pressing down and exerting force onto her back. I placed my hand on the back of her neck in preparation to use a pressure point if she continued to resist.

Filing 70-2 at 4.[13]

As the Eighth Circuit clarified just this year, "If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'" *Mitchell*, 28 F.4th at 896 (internal citation omitted). "Officers merely carrying out their duty as they understand it are not liable for . . . retaliatory use of force even if their understanding of their duty is mistaken—indeed, even if it is so mistaken as to be 'unreasonable.'" *Id.* at 897. *Mitchell* clarified that "[t]o be sure," an officer "may be liable for . . . use of excessive

---

[13] The Court does not assess whether Officer Malone's explanation is credible at this stage. *See Avenoso*, 19 F.4th at 1024 (noting that on a motion for summary judgment a district court could should not weigh evidence, make credibility determinations, or attempt to discern the truth on factual issues). The point is that Officer Malone has provided evidence on this motion that supports the contention he was not acting out of a retaliatory animus but was "merely carrying out [his] duty as [he] understood it[.]" *Mitchell*, 28 F.4th at 896; Filing 67 at 26 (Defendants arguing "Plaintiffs cannot establish that [Defendants'] actions were motivated in any manner by Plaintiffs' exercise of such activities"). As explained in the body of this decision Plaintiffs offer nothing sufficient to generate a jury question on Officer Malone's motive.

force . . . . But constitutional torts of retaliation require acting on retaliatory animus." *Id.* at 897–98; *see also Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (concluding that the defendants' "unreasonable mistake" precluded qualified immunity on a Fourth Amendment claim, but that this same unreasonable mistake was not enough to show a retaliatory animus).

Smith claims that she has "put forward affirmative evidence" that she was subject to excessive force for exercising her First Amendment rights. Filing 76 at 29. However, she only cites one specific incident relevant to her claim against Officer Malone. *See* Filing 76 at 29. She argues "Officer Malone aggressively tackled [her] immediately after she pulled out her phone to capture [Storrs's] tasing." Filing 76 at 29. This assertion is not accurate because the video footage shows that Smith had her phone out and pointed at Defendants well before Storrs was tased. *See* Filing 77-3 at 05:08–05:48; *Scott*, 550 U.S. at 380–81 (directing courts to "view the facts in the light depicted by the videotape" where the non-moving party's version of events is contradicted by video evidence). Indeed, Smith got her phone out and started pointing it at Defendants almost immediately upon exiting the vehicle. Filing 77-3 at 05:08. The video footage shows that Smith's phone remained in her hands from that time until Officer Malone began to physically restrain her. Filing 77-3 at 05:08–05:48.

Again, Officer Malone did not touch Smith or her phone until after Storrs was tased, Smith positioned herself within mere feet of Officer Rozeboom, and Smith stepped closer toward Officer Rozeboom as he attempted to begin handcuffing Storrs. *See* Filing 77-3 at 05:08–05:48. Therefore, to the extent Smith claims Officer Malone's use of force was in retaliation for filming Storrs's tasing, her claim necessarily fails because she went outside the bounds of what the First Amendment permitted once she began actively interfering with Storrs's detention along a dark and busy highway. *See Colten*, 407 U.S. at 109. Smith can only prevail on this claim if a reasonable

jury could find that Officer Malone would not have used such force against her "but for" the protected conduct she previously engaged in (*e.g.*, criticizing him, questioning his rank, demanding his badge number). *Graham*, 5 F.4th at 889. She cannot make out a First Amendment retaliation claim based on the unprotected actions she took outside the car.

A reasonable jury could not ignore everything that transpired from the time Smith left the car, including the physical resistance she exhibited after Sergeant Maas initially exerted minimal force in an effort to secure her compliance. Smith cannot rely on the mere temporal proximity between her protected conduct and Officer Malone's use of force. Her temporal proximity argument is significantly undermined by the fact that her unprotected conduct along the roadside immediately preceded the claimed adverse actions, and she had not engaged in protected conduct that was not mixed with unprotected interference after she got out of the car. Regardless, temporal proximity "is not enough on its own to create a triable issue of fact regarding cause where no other record evidence supports finding a retaliatory motive and there is evidence that the officers acted in good faith." *Graham*, 5 F.4th at 889.

There is no evidence that Officer Malone said anything to Plaintiffs that gives rise to a retaliatory inference. Nor is there any evidence that Officer Malone later told fellow law enforcement officers anything to the effect of "she had it coming." The Court recognizes that at this stage it must afford Smith "all reasonable inferences" from the evidence. *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). The Court likewise acknowledges that a "[r]etaliatory motive may be proved through 'circumstantial evidence giving rise to an inference of retaliatory intent[.]'" *Ackerman*, 19 F.4th at 1059. Even so, the evidence here is such that no reasonable jury could conclude that Officer Malone's use of force was motivated by anything other than that such force was called for in furtherance of his official duties including preventing Smith from interfering

73

further with officers during the incident. *Mitchell*, 28 F.4th at 896. This is so even if Officer Malone's actions were the result of an unreasonable mistake. *Id.*

 Smith's claim largely rests upon a speculative motive that she asks the Court to find despite the absence of any affirmative evidence supporting such a conclusion. That is not enough to present a jury question. "A [claim] founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Beaulieu v. Stockwell*, 46 F.4th 871, 876 (8th Cir. 2022) (alteration in original) (quoting *Yarborough v. DeVilbiss Air Power Inc.*, 321 F.3d 728, 730 (8th Cir. 2003)). "In sum, as between the obvious alternative explanation that [Officer Malone was] simply trying to maintain law and order and the retaliatory animus that [Smith] asks [this Court] to infer," no reasonable jury could find that Officer Malone would not have exercised the force that he did "but for" Smith's protected First Amendment activity. *See Mitchell*, 28 F.4th at 897 (cleaned up). The Court, therefore, grants summary judgment in Officer Malone's favor on this claim.

f.  Storrs's First Amendment Retaliation Claims

The Court now addresses the First Amendment retaliation claims that pertain only to Storrs. In his operative Complaint, Storrs alleges that he was (1) tased without warning, (2) pinned down to the ground, (3) threatened with another tasing, (4) and surrounded by officers brandishing "military-style" weapons in retaliation for criticizing Defendants. Filing 17 at 10 (¶62). The Court previously concluded that Storrs engaged in at least some activity that was protected by the First Amendment on the night in question. The questions that remain relate to the second and third prong of the First Amendment retaliation test—did Storrs suffer an adverse action sufficient to chill a person of ordinary firmness and, if so, is there a causal connection between this adverse action and his exercise of protected activity? *Hoyland*, 869 F.3d at 655.

74

i. No "Military-Style Weapons" were Brandished by Defendants and this Claim is Waived, and "Surrounding" Storrs was not Caused by his Protected Conduct

Storrs does not elaborate on what he means by "military style weapons" in the portion of his operative Complaint alleging a First Amendment retaliation claim. This is ostensibly a reference to the "AR-15" he claimed Defendants were wielding in his Fourth Amendment excessive force claim. *See* Filing 17 at 9 (¶56). However, as this Court previously noted, Plaintiffs have since conceded that Defendants did not carry or brandish an AR-15 assault rifle that night. Filing 67 at 11 (¶69); Filing 76 at 11 (¶69). There is also nothing in the record to suggest that Plaintiffs' claim was in reference to something else. Nor do Plaintiffs address this discrete claim in their brief. *See generally* Filing 76 at 28–29. Because "the non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment[,]" Plaintiffs have waived this claim by failing to oppose summary judgment on this basis. *Paskert*, 950 F.3d at 540.

Assuming arguendo that merely "surrounding" Storrs is adverse action sufficient to chill a person of ordinary firmness, *Hoyland*, 869 F.3d at 655, there is no evidence of a causal connection. That is, no reasonable juror could conclude that the Officers would not have "surrounded" Storrs "but for" his lawful criticisms. *Graham*, 5 F.4th at 889. Even when taking the evidence in the light most favorable to Storrs and affording him the benefit of all reasonable inferences, the lack of a causal connection is so "free from doubt as to justify taking it from the jury." *Peterson*, 754 F.3d at 603. Unlike the plaintiff in *Peterson*, Storrs has not "presented affirmative evidence" that Defendants took this alleged adverse action against him "in retaliation for criticizing" them. *Id.* It is true that each of the three Defendants initially positioned themselves around Storrs's vehicle,

75

but because this was a roadside stop that was the logical place for them to go. Once Storrs exited the vehicle, he continued to disobey their directives. There is no evidence that shows Defendants would not have "surrounded" Storrs in the face of his repeated disobedience alongside a dark and busy highway "but for" Storrs's protected criticisms. Again, it is not enough to "show that the defendant arrested or used force against the plaintiff in response to conduct that in fact was protected. If the response was driven not by 'animus' but by the defendant's understanding— however mistaken—of his official duties, then it was not 'retaliatory.'" *Mitchell*, 28 F.4th at 896 (internal citation omitted). Here, there is ample evidence that the officers reasonably believed their conduct was required to control the situation. Accordingly, Defendants are entitled to summary judgment on this claim.

> ii.  Storrs's Protected Conduct Was Not the "But For" Cause
> of His Tasing

Turning next to Storrs's claim that he was retaliated against when Defendants tased him without warning, pinned him to the ground, and threatened him with another tasing, the Court likewise concludes that Defendants are entitled to summary judgment. As a threshold matter, there is no evidence that Officer Malone was involved in any of this. This alone entitles him to summary judgment on this claim. *See Ashcroft*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government official-defendant, through the official's own individual actions, has violated the constitution"). This claim only involves the actions of Officer Rozeboom and Sergeant Maas. Additionally, Storrs does not argue that his tasing was "without warning" or that Defendants "threatened" him with another tasing in his brief. He has, therefore, waived these discrete aspects of his claim. *Paskert*, 950 F.3d at 540. The pertinent portion of his brief focuses solely on the tasing itself. *See generally* Filing 76 at 28–29. However,

76

because Plaintiffs also refer to a "tackling" without specifying whom they are referring to, the Court will also assess the claim in his Complaint that he was "pinned down" in retaliation for exercising his protected rights.

The Court concludes that in addition to meeting the first prong of the test by showing that he engaged in a protected activity, Storrs has also met his burden under the second prong by providing evidence that he suffered an adverse action sufficient to chill a person of ordinary firmness from engaging in such protected activity. *Hoyland*, 869 F.3d at 655. There is no dispute that Storrs was tased and pinned to the ground. One could reasonably conclude that these actions on the part of Officer Rozeboom and Sergeant Maas would chill a person of ordinary firmness from continuing to criticize law enforcement. *See id.* If mere "embarrassment, humiliation, and emotional distress may be sufficient to support" the existence of an adverse action, *see Naucke, 284 F.3d at 928*, then the conduct at issue here is enough. Once again, this claim turns on the third prong of the test, which asks whether there is a causal connection between the adverse action and the protected activity. *Hoyland*, 869 F.3d at 655.

Storrs' retaliation claim for being tased and pinned to the ground in some ways mirrors Smith's retaliation claim against Officer Malone for being tackled and pinned to the ground. Like her, Storrs has not provided affirmative evidence sufficient to generate an inference that Defendants would not have tased him or pinned him to the ground "but for" the protected statements he made. *See Mitchell, 28 F.4th at 896 (8th Cir. 2022)* ("to prevail on a First Amendment retaliation claim, the plaintiff must show that the defendant would not have taken the adverse action but for harboring 'retaliatory animus' against the plaintiff because of his exercise of his First Amendment rights"). The Court reaches this conclusion even when viewing the evidence in the light most favorable to Storrs. *Grinnell Mut. Reinsurance Co., 34 F.4th at 652.*

77

Storrs does not point to any evidence raising a reasonable inference that Officer Rozeboom or Sergeant Maas took the actions they did in order to retaliate against Storrs for criticizing them. Here again, *Mitchell* is instructive. When law enforcement officers are simply "carrying out their duty as they understand it" they "are not liable for . . . retaliatory use of force even if their understanding of their duty is mistaken—indeed, even if it is so mistaken as to be 'unreasonable.'" *Mitchell*, 28 F.4th at 897. In his brief, Storrs rather conclusively posits that when viewing the facts in the light most favorable to him, a jury could conclude that his treatment—particularly the tasing—was motivated at least in part by the exercise of his First Amendment right to question Defendants. Filing 76 at 29. To overcome summary judgment, he needs "to present evidence of a causal connection between the constitutionally protected activity and the adverse action." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). Storrs has not provided any affirmative evidence that produces doubt about Defendant's motivations in using the manner of force that they did. Viewed in the light most favorable to him, no reasonable jury could conclude that Defendants tased Storrs and pinned him to the ground because of anything other than their understanding—however mistaken—of [their] official duties . . . ." *Mitchell*, 28 F.4th at 896. As the Court previously noted when it addressed Storrs's Fourth Amendment claim of excessive force against Officer Rozeboom, Plaintiffs provided an excerpt from Officer Rozeboom's deposition as evidence on this motion. This evidence directly undermines any contention that Officer Rozeboom acted with a retaliatory animus when he tased Storrs. Officer Rozeboom said in his deposition that he deployed his taser based on his perception at the time that Storrs was going to assault Sergeant Maas. Filing 77-5, Exhibit D at 32-33.

Again, this evidence may support Plaintiff's theory that Officer Rozeboom was mistaken, but when law enforcement officers are simply "carrying out their duty as they understand it" they

"are not liable for . . . retaliatory use of force even if their understanding of their duty is mistaken—indeed, even if it is so mistaken as to be 'unreasonable.'" *Mitchell*, 28 F.4th at 897. At bottom, Storrs has not sufficiently established at this stage that the adverse actions he complained of would not have happened "but for" a retaliatory animus on the part of Officer Rozeboom and Sergeant Maas. *Graham v. Barnette*, 5 F.4th at 889. Even when giving him the benefit of all reasonable inferences and viewing the evidence in the light most favorable to him, at best he has shown that they were carrying out their duties as they understood them—even if perhaps mistakenly so. *Mitchell* 28 F.4th at 897. Accordingly, the Court grants summary judgment in Defendants' favor on this claim.

### 5. *Count V – The Unlawful Vehicle Search Claim*

In the fifth and final count of their Second Amended Complaint, Plaintiffs claim that their right to be free from unreasonable searches, as guaranteed by the Fourth and Fourteenth Amendments, was violated when their vehicle was searched after they were placed in handcuffs. This claim is made by both Plaintiffs against all Defendants. Filing 17 at 10. However, viewing the evidence in the light depicted by the video footage, *Scott*, 550 U.S. at 381, it is clear that Officer Rozeboom was not involved in any search of the vehicle. Plaintiffs do not suggest otherwise in their brief. *See generally* Filing 76 at 29–30. The only individual who searched the vehicle was Officer Malone. Officer Rozeboom did not direct Officer Malone to search the vehicle, nor did he search it himself. Therefore, the Court grants summary judgment in Officer Rozeboom's favor on this claim. *See Ashcroft*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government official-defendant, through the official's own individual actions, has violated the constitution"). However, because Officer Malone searched the

vehicle at Sergeant Maas's direction, both Officer Malone and Sergeant Maas are fairly included within this claim. *Id.*

      a.   The Parties' Arguments

Defendants seek summary judgment on this final count based primarily on their contention that there was sufficient probable cause for the search of the vehicle. Defendants argue there was probable cause to search the vehicle because "there was a fair probability that items of stolen merchandise would have been in the vehicle." Filing 67 at 28. Defendants also argue probable cause to search the vehicle existed based upon the "odor of marijuana emitting from the [v]ehicle." Filing 67 at 28. Defendants further posit that "Smith, as a mere passenger of the [v]ehicle, lacks standing to assert a claim based on [an] unlawful search of the [v]ehicle." Filing 67 at 28. Defendants do not contest Storrs's standing to challenge the search.

Plaintiffs contend that when viewed in the light most favorable to them, probable cause did not exist and "ample factual questions remain on each and every basis provided by Defendants justifying the alleged probable cause." Filing 76 at 30. Plaintiffs rely on what they describe as the "conflicting stories regarding the alleged smell or presence of marijuana in [Storrs'] vehicle." Filing 76 at 21; *see also* Filing 76 at 30. They specifically emphasize that after searching the vehicle, Officer Malone verbally reported that he found "nothing" in it. Filing 76 at 21; *see also* Filing 70-2, Exhibit B at 17:40. However, they note Officer Malone's written report says "he found pieces of marijuana on the floor which he had not previously reported or documented." Filing 76 at 21-22 (citing Filing 70-2, Exhibit A at 2 (Officer Malone stating in his written report that he during his search of the vehicle he "located small pieces of marijuana, explaining the odor of marijuana")). Based on these discrepancies, Plaintiffs argue it is appropriate for a factfinder to

assess credibility to resolve this claim, thereby making summary judgment inappropriate. *See* Filing 76 at 22.

     b. Applicable Standards

"If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search[.]" *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (alteration omitted) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)). That includes a passenger's personal belongings. *Murillo-Salgado*, 854 F.3d at 418 (citing *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999). "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S. at 243-44. The Eighth Circuit has "repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception[.]" *United States v. Shumaker*, 21 F.4th 1007, 1017-18 (8th Cir. 2021); *accord United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020).

It is also a "settled principle that law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (citing *United States v. Hensley*, 469 U.S. 221, 232, (1985); *Baker v. McCollan*, 443 U.S. 137, 145–46, (1979); *Brown v. Nutsch*, 619 F.2d 758, 764–65 (8th Cir. 1980)). Likewise, "an assisting officer is entitled to rely on the probable cause determination of the arresting officer and may receive qualified immunity as long as the reliance is reasonable." *See Ehlers*, 846 F.3d at 1010; *see also Mendoza v. United States Immigr. & Customs Enf't,* 849 F.3d 408, 419 (8th Cir. 2017) (concluding county employees would be entitled to qualified immunity in a § 1983 claim for unlawful detention because they "conducted an

81

adequate investigation and reasonably relied on [an Immigration and Customs Enforcement officer's] probable cause determination" when they detained the plaintiff).

c.   Defendants Are Entitled to Qualified Immunity Because They
Had Arguable Probable Cause Based on the Odor of Marijuana

The Court will begin by first addressing Defendants' argument that Smith lacks standing because without standing there is no subject matter jurisdiction over her claim. *Friedmann v. Sheldon Cmty. Sch. Dist.*, 995 F.2d 802, 804 (8th Cir. 1993); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) ("We have 'an obligation to assure ourselves' of litigants' standing under Article III."). "It is well established that the Civil Rights Act, 42 U.S.C. § 1983 . . . cannot confer standing. The statute does not itself create substantive rights, but 'merely provides remedies for deprivations of rights established elsewhere.'" *Tarsney v. O'Keefe*, 225 F.3d 929, 939 (8th Cir. 2000). The Eighth Circuit has also said that, "A passenger who asserts 'neither a property nor a possessory interest' in a vehicle lacks a reasonable expectation of privacy in the vehicle." *United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019). Without a reasonable expectation of privacy in a car, an individual "has no standing to challenge the legality of the search" of that car. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

Plaintiffs do not point to any evidence that Smith had a proprietary or possessory interest in the vehicle. However, Officer Malone's body camera footage shows that during the search of the vehicle he specifically examined the contents of a pink purse located in the front passenger side of the vehicle where Smith was sitting. Filing 70-2, Exhibit B at 14:35-15:45. Viewing the evidence in the light most favorable to Smith, the fact that this pink purse was located in the front

82

passenger's side of the vehicle supports a logical inference that the purse was hers and that she maintained a reasonable expectation of privacy in the purse itself.[14]

However, even if this Court were to conclude that Smith had limited standing to challenge the search of the purse, she still would not prevail because Officer Malone's search was supported by at least arguable probable cause. The video footage in this case shows that, at various points, all three Defendants stated they smelled the odor of marijuana. After securing Smith in the back of a patrol car, Officer Malone can be heard telling Officer Rozeboom, "There's also a heavy odor of marijuana." Filing 70-1, Exhibit B at 13:20. Officer Rozeboom responded back by saying, "Yeah, I keep getting that smell." Filing 70-1, Exhibit B at 13:25. At the time the two made these remarks, Sergeant Maas was not a party to their conversation but can be seen in the background of the video speaking to Storrs. *See* Filing 70-1, Exhibit B at 13:20–13:45. Later, while still talking to Storrs, Sergeant Maas's body camera captures him telling Storrs that he could smell marijuana coming from him and his car. Filing 70-3, Exhibit B at 10:20. In his written report following the incident, Sergeant Maas also stated that he could smell the odor of marijuana coming from Storrs' person as well as his vehicle. Filing 70-3, at 1, 5.

---

[14] The Eighth Circuit does not appear to have clearly addressed whether a passenger has standing to challenge the search of her personal items located within a car that is not hers. The most recent case to consider this subject seems to be *United States v. Davis*, 943 F.3d 1129 (8th Cir. 2019). However, even in that case the Eighth Circuit did not specifically discuss this precise, insular question. The Eighth Circuit only addressed the district court's unreasonable detention analysis. *See generally Davis*, 326 F. Supp 3d at 1129–1134. The Court notes that other federal district courts in the Eighth Circuit have found that a passenger has standing to challenge the search of personal belongings located in a vehicle. *See e.g.*, *United States v. Trejo*, 135 F. Supp 3d 1023, 1031 (D.S.D. 2015) ("When a passenger in a vehicle has a legitimate expectation of privacy in a bag located therein, he may challenge a search of that bag even though he lacks standing to challenge the search of the vehicle"); *see also United States v. $32,780.00 in United States Currency,* No. 8:15CV131, 2016 WL 355476, at *3 (D. Neb. Jan. 29, 2016) (concluding that an individual lacked standing to challenge the search of the car, but maintained standing to challenge the search of his bag located within the car). Other United States Courts of Appeals have reached similar conclusions. *See e.g.*, *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (a passenger in a bag car had standing to challenge the search of his bag, even if he lacked standing to contest the search of the car); *United States v. Iraheta*, 764 F.3d 455, 462 (5th Cir. 2014) (where neither passenger denied ownership of a duffle bag in the vehicle in which they were riding, they had not abandoned the bag, and had standing to challenge the search of the bag).

The Court is precluded from making "determinations of fact and credibility in assessing whether a party is entitled to qualified immunity." *Williams v. City of Burlington, Iowa*, 27 F.4th 1346, 1351 (8th Cir. 2022). Nevertheless, if there is no genuine dispute of material fact as to whether Defendants actually did smell the odor of marijuana, then they are entitled to qualified immunity given Eighth Circuit precedent holding that the odor of marijuana provides probable cause for a warrantless search of a vehicle. *See Shumaker*, 21 F.4th at 1017-18.

No one disputes that each of the three Defendants said they smelled marijuana before the vehicle was ever searched. The video footage clearly captures this. Moreover, Officer Malone did not search the vehicle until after conferring with Sergeant Maas and Officer Rozeboom. Filing 70-3, Exhibit B at 11:10–14:00. Sergeant Maas, not Officer Malone, was the first person to state that there was probable cause to search the car. Filing 70-3, Exhibit B at 11:10. After Officer Malone and Sergeant Maas told one another that they detected an odor of marijuana, Sergeant Maas directed Officer Malone to conduct the search of the vehicle. Filing 70-3, Exhibit B at 11:12. There is no evidence raising an inference of a conspiracy on the part of Defendants to just make this up. Plaintiffs have neither pleaded nor argued that this assertion by all three officers was a pretext uttered in order to circumvent what they believed would otherwise be an unlawful search.

Consistent with the settled principle that assisting officers are entitled to rely on the probable cause determinations of other officers when such reliance is reasonable, *Ehlers*, 846 F.3d at 1010, Officer Malone was entitled to rely on Sergeant Maas's determination that there was probable cause to search the car. This reliance was also objectively reasonable not just because Officer Malone himself said that he smelled the marijuana, but also because Officer Rozeboom said the same thing. Accordingly, there is no need to assess witness credibility in order to resolve this issue; the car was searched by one law enforcement officer in reasonable reliance on the

84

probable cause determination of another law enforcement. That settles the matter at least as far as qualified immunity is concerned. *Ehlers*, 846 F.3d at 1010.

Whether Officer Malone found remnants of marijuana in the car does not ultimately matter. "[W]e do not evaluate probable cause in hindsight, based on what a search does or does not turn up." *Florida v. Harris*, 568 U.S. 237, 249 (2013). The fact that Officer Malone's written report differs from what he said on the scene is inapposite. Any discrepancy between what he claimed to have initially found at the scene and what he said later on in his written report has no bearing on the question of whether there was probable cause (or arguable probable cause) at the time of the search itself. *Cf. United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (noting it is axiomatic that probable cause must exist at the time of the search). Because Officer Malone relied on another officer's probable cause determination and because that reliance was objectively reasonable for the reasons previously discussed, Defendants are entitled to qualified immunity.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment in in full. Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment, Filing 63, is granted. Plaintiffs' claims as alleged in their Second Amended Complaint, Filing 17, are dismissed with prejudice.

Dated this 14th day of October, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge

85